COMMONWEALTH vs. RICHARD BAPTISTE.

Bristol.    December 6, 1976. — June 8, 1977.

Present: HENNESSEY, C.J., QUIRICO, BRAUCHER, KAPLAN,
& WILKINS, JJ.

*Supreme Judicial Court, Argument. Homicide. Practice, Criminal,*
Exceptions: failure to save exception; Disclosure of evidence, Argu-
ment of prosecutor. *Evidence,* Opinion: expert; Relevancy and ma-
teriality.

At a murder trial, the judge did not err in allowing the prosecutor to
ask a medical examiner several hypothetical questions where the
combined testimony of several witnesses was sufficient to permit the
jury to infer the facts upon which the questions were based. [706-
708]
A card bearing a fingerprint of the defendant which was found at the
scene of two murders was properly admitted in evidence where the
chain of custody of the card was established even though there were
weaknesses in the chain. [708-709]
At a murder trial, there was no error in admitting in evidence a pair
of bloodstained socks found in the defendant's apartment five weeks
after the crime. [710]
At a murder trial, there was no error in admitting in evidence a lamp
belonging to the victims which the defendant had given to a witness
shortly after the crime. [711-712]
A defendant convicted of murder was not entitled to relief under G. L.
c. 278, § 33E, on account of allegedly improper arguments by the
prosecutor in his summation to the jury where the argument did not
exceed the limits of the inferences which the jury could draw. [712-
713]

INDICTMENTS found and returned in the Superior Court
on May 3, 1974.

The cases were tried before *Brogna,* J.

*Richard N. LaSalle (Raymond Mullen* with him) for
the defendant.

*Francis M. O'Boy,* Assistant District Attorney (*Earl M.
Seligman,* Assistant District Attorney, with him) for the
Commonwealth.

QUIRICO, J.    The defendant appeals under G. L. c. 278,
§§ 33A-33G, from his convictions on two indictments

charging the crimes of murder. The indictments were tried together and they resulted in verdicts of guilty of murder in the first degree for which the defendant received two sentences of life imprisonment in the Massachusetts Correctional Institution at Walpole to be served consecutively.

Although the defendant originally assigned many alleged errors by the trial judge, and has listed fourteen such errors to be argued in his brief, the brief includes purported argument on only ten issues, nine of them dealing with rulings on the admissibility of evidence, and one dealing with alleged improper closing argument by the prosecutor. All assignments not argued in the brief are treated as waived. S.J.C. Rule 1:13, as amended, 366 Mass. 853 (1975). *Commonwealth* v. *Baker*, 368 Mass. 58, 61 (1975). As to certain of the assignments of error purported to be argued in the defendant's brief, the coverage consists of no more than "a terse and very sketchy reference ... [thereto], but it falls short of anything that can properly be called argument." *Lolos* v. *Berlin*, 338 Mass. 10, 14 (1958). *Commonwealth* v. *Martin*, 358 Mass. 282, 290 (1970). We note that the argument on the nine alleged errors in evidentiary rulings does not include a single citation to a statute, judicial precedent, or other authority in support thereof.

We have examined all the alleged errors which were actually argued and we conclude that as to those there was no error. Additionally, as to each indictment we have considered the whole case on the law and the evidence as required by G. L. c. 278, § 33E, and we conclude that the defendant is entitled to no relief thereunder.

Before considering each of the ten assignments of alleged error it may be helpful to summarize some of the evidence presented against the defendant.

In July, 1973, the defendant, who was then thirty-nine years of age and was serving a sentence imposed on him for an offense in California, escaped from a forestry prison camp and returned to New Bedford in this Commonwealth where he had previously lived for some time. He obtained employment as a helper on a truck and also worked several

evenings each week at a lounge which served liquor. Sometime in August, 1973, he met Donna Rebello, age twenty-three, at the lounge. She lived in an apartment at 474 County Street in New Bedford. He moved into an apartment in the same building on November 15, 1973. He testified that on that date, after moving in, he first learned that Donna Rebello lived at the same address. He further stated that on that date and on four or more occasions in the next several weeks he was intimate with her in either his or her apartment, and that Beverly Plaud, age nineteen, lived in the same apartment with Donna. About November 28, 1973, the defendant moved to an apartment at 34 Reynolds Street in New Bedford. That evening the defendant was at work at the lounge and Donna was a patron there for several hours, leaving about 10 P.M.

About 6 A.M. of the next day police officers found both Donna and Beverly dead in their apartment. There was medical testimony that on the body of Beverly there were about fifty stab wounds, seventeen of which went deep enough into the chest and abdomen to involve both lungs, the heart, the liver, and the stomach, and that there were also numerous blunt injuries. Her death was caused by the multiple stab wounds. On the body of Donna there were widespread blunt injuries, and there were two stab wounds on the neck cutting the main artery which brings blood to the face and brain, and cutting deeply enough to hit the spine. Her death was caused by the stab wounds and perforation of arteries.

On November 29, 1973, the New Bedford police arrested and charged a person other than the defendant with the murders. That person was also a tenant in the building at 474 County Street, and he was arrested after positive benzidine tests were made of his person, clothing, and portions of his apartment on November 30, 1973. The suspect explained that he had handled some dog food and was thus exposed to blood, and he denied ever being in the apartment of the victims.

After the arrest of the first suspect the police continued their investigation. They had information that a portable

television belonging to Beverly and which was in the apartment on November 28, 1973, was missing when they discovered the crimes. They also continued to check out fingerprints found in the apartment and they excluded the possibility that the prints were those of the suspect already arrested, the victims, or any of the police officers. One such fingerprint was an imprint in blood on a health identification card which had been issued by the New Bedford health department to Donna Rebello on November 16, 1973, to indicate that she had undergone a tuberculin skin test. That card was found by the police on the floor of a room in the victims' apartment on November 30, 1973, after the bodies and a number of articles had been removed. On January 5, 1974, the print on the health card was compared to prints in the police files and was identified as that of the defendant.

On the next day several members of the New Bedford police department and counsel for the department went to the Plymouth County house of correction where the defendant was being held as a fugitive from California, and they questioned him about the two killings. They first informed him of his rights under the Miranda rule, *Miranda* v. *Arizona*, 384 U.S. 436 (1966), and then told him of the identification of his fingerprint on Donna's health card. They noticed that there was a television in his jail room or cell and they identified it as the one which had disappeared from Beverly's room on the night of the killings. The defendant said that a week before the killings he had purchased it from Donna for $20. The police told him that they had a witness who could place the television in the victims' apartment on the evening before their deaths.

The defendant then said that he had an idea the police were going to charge him with murder, but that he would tell them the truth, and he made the following statement. On the evening of November 28, 1973, he arranged with Donna to meet her at her apartment after he ended his work at the lounge. He arrived at her apartment about 1:30 or 1:40 A.M. on November 29, found the door ajar,

saw Donna's body on the floor, and started to call the police but, realizing that he was a fugitive from justice, he did not complete the call. He looked into the bedroom and saw Beverly lying on the floor at the foot of the bed. He rummaged through a wallet. As he was backing out of the bedroom he saw that the television was still turned on and was flickering and he took it and left the apartment. His statement was in some respects different from a statement he had given the police in the early stages of the investigation.

There were other developments which tended to shift suspicion of guilt away from the person first arrested by the police and toward the defendant. One development occurred at a New Year's party on December 31, 1973, or early on January 1, 1974, when the defendant made the statement that he did not believe that the person originally arrested by the police for the killing of Donna and Beverly had committed the crimes, and that the cuts on the victims "looked like they were surgical wounds or cuts." The police were told about this statement at a later time. Another development occurred on April 7, 1974, when the suspect first arrested was subjected to a polygraph test at the request of the police. The test was administered by Leonard H. Harrelson, the president of Leonard Keeler, Inc., and director of the Keeler Polygraph Institute, who had conducted tests on approximately 50,000 individuals over a period of about twenty years. His basic conclusion from the test was that the suspect was telling the truth when he denied that he had committed the homicides. The defendant was indicted for these crimes on May 3, 1974, and the man first arrested was never tried.

It would add nothing of jurisprudential value to this opinion to spread on the record any details of the evidence describing gory and sordid aspects of the case except to the extent that it may be necessary to do so in the discussion of the ten alleged errors which the defendant purports to argue separately in his brief.

The cases were submitted to the jury for decision after

a charge from the judge which included instructions on two categories of murder in the first degree as defined by G. L. c. 265, § 1, viz., "[m]urder committed with deliberately premeditated malice aforethought, or [murder committed] with extreme atrocity or cruelty." There is no claim of error in the instructions.

1. A crucial issue of fact in these cases was the time at which the two victims were killed. The Commonwealth attempted to prove that the deaths occurred at the approximate hour of 1:30 or 1:40 A.M. on November 29, 1973, which, by the defendant's admission to the police at the Plymouth County house of correction on January 6, 1974, and again while he testified at his own trial, was the approximate hour and date that he arrived at the victims' apartment.

There was evidence that between 8 and 10 P.M. on November 28, 1973, Donna Rebello had partaken of some alcoholic beverages at the lounge where the defendant was working, and that she appeared drunk when she left there about 10:30 P.M. An autopsy was performed on her body about 8 P.M. on the next day by Dr. George Katsas and a blood test at that time disclosed no alcohol level. Dr. Katsas was an associate medical examiner for Suffolk County and a medical-legal expert of broad experience, having performed close to 6,000 autopsies and having testified as an expert in numerous cases. His qualifications as a medical-legal expert were not questioned.

As a prosecution witness Dr. Katsas described the process by which alcohol consumed by a person passes through the stomach and intestines, reaching the bloodstream in about an hour, and also the process by which "the body burns the alcohol gradually and . . . eliminates the alcohol through the urine and through the breath." He testified that if a person had a blood alcohol level when he died, from whatever cause, the alcohol elimination process would stop and that the blood test made at the time of the autopsy on Donna's body would still show the same alcohol level as that existing at the time of her death.

The prosecutor then asked Dr. Katsas to assume certain facts about Donna, including the fact that she consumed four "screwdrivers," each including one ounce of vodka, from approximately 8 to 10 P.M. on November 28, 1973, that she was found dead about 6 A.M. of the following day, and that a test performed about 8 P.M. showed no blood alcohol level. He then asked the doctor: "[W]ould the lack of a blood alcohol level indicate a lapse of time between the time the female last consumed some alcoholic beverages and the time that she died?" The doctor answered that it would.

After the answer the defendant objected on the ground that there was insufficient evidence on which to base an assumption that Donna had consumed four alcoholic drinks in the two-hour period in question.

The objection coming after the question was answered was not timely. "The rule generally prevailing in this Commonwealth is that objections to matters of evidence must be seasonably made and exceptions taken when the evidence is offered . . .; and a party cannot of right insist upon saving an exception to evidence by thereafter seeking to have the evidence struck out or to avoid its effect by presenting the point in a motion for a new trial." *Commonwealth* v. *Theberge,* 330 Mass. 520, 527 (1953). *Commonwealth* v. *Silvia,* 343 Mass. 130, 136 (1961). *Commonwealth* v. *Geagan,* 339 Mass. 487, 513, cert. denied, 361 U.S. 895 (1959). *Commonwealth* v. *Doyle,* 323 Mass. 633, 634-635 (1949). Here there was no timely objection to the question, nor was there a motion to strike the question or answer. In any event, the answer was responsive to the question.

If there had been a timely objection the result would be the same in these cases because a careful reading of the transcript discloses that the combined testimony of several witnesses, including that of the defendant, was sufficient to permit the jury to infer that Donna had consumed alcoholic drinks in the quantity and the time period encompassed by the hypothetical question. It was thus

for the jury, and not the judge, to decide whether they would draw such an inference. *Commonwealth* v. *Taylor*, 327 Mass. 641, 649 (1951). *Commonwealth* v. *Noxon*, 319 Mass. 495, 538 (1946).

2. The prosecutor repeated the same hypothetical question discussed above and asked Dr. Katsas to assume further that on that same evening of November 28, 1973, Donna "was observed between 10 and 10:30 ... to be drunk ... [and that she] had no more to drink after ten to 10:30." He was then asked whether, on the basis of all the assumed facts, "the lack of blood alcohol [would] indicate a lapse of time between the time the female [Donna] consumed her last drink and the time she died." The doctor answered that "it would definitely indicate a lapse of time between the last drink and the time of death." In answer to further questions the witness testified that the assumed facts would not be consistent with death at 11:30 P.M. on November 28, because "[s]he would have been expected to still have alcohol in her blood at that time."

At that point the defendant objected, moved that the answer be struck, and saved an exception. For all of the reasons stated in disposing of the first alleged error discussed above, the objection was not timely, and the motion to strike was not appropriate because the answers were responsive. Also, if the defendant had objected seasonably, the result would be the same because there was sufficient evidence to permit an inference of the facts assumed in the hypothetical question.

Immediately after the defendant saved the exception involved here, Dr. Katsas was asked whether the same assumed facts would be "consistent with death at some time after 1:30 a.m. that morning" and he answered that they would. There was no objection or exception by the defendant to that.

The doctor also testified further, without objection, that the many "blunt injuries" which he observed on the bodies of both victims had been inflicted before death and that,

because of the nature of the stab wounds to her neck, Donna Rebello "could live only a matter of minutes, maybe as many as five, not more than ten, after she sustained the wounds of the neck."

3. Dr. Katsas testified that tests disclosed the presence of many spermatozoa on vaginal smears taken from both victims and small numbers of spermatozoa on oral smears taken from the mouth of one victim. He was then asked to assume as to that victim substantially the same facts as to her drinking which were assumed in the first two alleged errors described above and then to state whether he had an opinion as to when the sperm found in that victim's mouth would have been deposited. He said that he did have such an opinion and when he was asked to state it, the defendant objected and gave as a basis the same claim of an improper assumption that the victim had consumed four "screwdrivers."[1] That is the same basis for objection which we considered and rejected as to the errors discussed above, and we reject it as to the present objection for the same reasons. The doctor then testified that in his opinion "the sperm was deposited after the drinking or shortly before death, because of the tendency of anything in the mouth including the normal secretions to dissipate the sperm and propel it towards the stomach."

4. The defendant contends that it was error for the judge to admit in evidence Donna's health identification card which was found on the floor of her apartment two days after her death and on which there was an imprint in blood of the defendant's fingerprint. The sole basis for the objection is the defendant's claim that "the discovery

---

[1] At this point in the trial the judge instructed the jurors as follows: "Mr. Foreman, and other members of the jury. If you notice, as the basis for an opinion asked of the doctor specifically, he is asked to assume certain things. Now, the reason that is done, is because you are the ones who determine from the evidence as to what happened or did not happen. If you find that one or more of the facts that the doctor has been asked to assume and upon which he predicates his opinion, if you find that one or more of those assumptions is not true, then, of course, in your evaluation of his opinion based upon those assumptions, you may ignore his opinion."

of this card and its subsequent custody is certainly somewhat unusual and tainted."

This card was found by a police lieutenant who was working on the case at the victims' apartment on the afternoon of November 30, 1973. Prior to that time the bodies and a number of articles had been removed from the apartment. The card bearing Donna's name and dated November 16, 1973, was found on the floor of the bedroom. The lieutenant did not tell the chief of police or any of the other officers present that he had found it. Instead he put it in his pocket and brought it to the police station. Late that same evening he left it at the office of the identification bureau which was then closed. It was found there by the sergeant in charge of the bureau the next morning. He then processed it and ultimately, on January 5, 1974, identified it as bearing a print of the defendant.

There was ample evidence from which the jury could find that the card offered in evidence was the same card found by police in the victims' apartment on November 30 and that the print thereon was that of the defendant. Even if we accept the defendant's argument that the lieutenant's handling of the card after its discovery was unusual and that he might better have turned it over promptly to the chief of police or some other officer present at the scene, that does not render the card inadmissible as evidence. As we said in *Commonwealth* v. *Hogg,* 365 Mass. 290, 294-295 (1974), "If there were weaknesses in the chain of custody, that would go to the weight of the evidence rather than to its admissibility. *Commonwealth* v. *White,* 353 Mass. 409, 419-420 (1967), and cases cited. See McCormick, Evidence (2d ed.) § 212 (1972)." At best these weaknesses in the chain of custody gave the defendant an argument to the jury on the question of the weight of the evidence, and he availed himself fully of that opportunity. There was no error in admitting the card and related matters in evidence. See *Commonwealth* v. *Giacomazza,* 311 Mass. 456, 470 (1942), and cases cited.

5. The sum total of the defendant's purported argu-

ment, including its title, on the next alleged error is reproduced in the margin.[2] "[I]t falls short of anything that can properly be called argument" under S.J.C. Rule 1:13, and we therefore do not discuss it further. *Lolos* v. *Berlin*, 338 Mass. 10, 14 (1958).

6. From about November 28, 1973, until January 4, 1974, when the defendant was arrested as a fugitive from California, he lived in an apartment at 34 Reynolds Street in New Bedford. On January 7, 1974, the police obtained and executed a search warrant on the apartment and found a pair of men's white socks in a bedroom closet. There appeared to be bloodstains on the socks, and on laboratory examination it was determined that the stains were from type "O" human blood. It was also determined that the victim Donna's blood type was "O" and that of Beverly was "A."

The only argument made by the defendant on this point is that the socks should have been excluded because they were found over five weeks after the crime, "and thus were too remote in time and space." There is no merit to this argument. "Articles found at the scene of a crime or in the home of a defendant, or which can be traced to the possession of a defendant and are material to an issue, have been frequently admitted in evidence." *Commonwealth* v. *Giacomazza*, 311 Mass. 456, 470 (1942), and cases cited therein. *Commonwealth* v. *Noxon*, 319 Mass. 495, 539-540 (1946).

7. and 8. The sum total of the defendant's purported arguments, including titles, on the next two alleged errors

---

[2] "THE TRIAL JUDGE ERRED IN EXCLUDING FROM EVIDENCE CERTAIN STATEMENTS ALLEGEDLY MADE BY THE DECEASED TO HER FATHER, WHICH EVEN THOUGH BASED ON HEARSAY CONSTITUTED EXCULPATORY EVIDENCE AND SHOULD HAVE BEEN ADMITTED. The defendant respectfully calls attention of this Honorable Court to the bench and lobby conferences recorded on Pages 873 through 872 [*sic*] of Volume VI of the trial transcript and contends that it constituted prejudicial error to allow exculpatory evidence up to a point and then to exclude such evidence."

is reproduced in the margin.[3] They also fall "short of anything that can properly be called argument" under S.J.C. Rule 1:13, and we therefore do not discuss them further. *Lolos* v. *Berlin*, 338 Mass. 10, 14 (1958).

9. On May 23, 1975, the twelfth day of the trial, the prosecution called as a witness a woman with whom the defendant lived for some months before moving to the building where the homicides occurred. The witness brought with her that day an electric lamp which she testified the defendant had given to her a week or two after the homicides occurred. The lamp was identified by another witness as having been in the apartment of the victims prior to their deaths. The defendant contends that it was error to admit the lamp in evidence, and his total argument on this consists of two sentences. There is no merit to his contention, assuming the two sentences are entitled to be considered as adequate argument.

He argues in one sentence that the lamp "should have been excluded from evidence as the time element is too remote in time from the date of the crime and in fact had not been placed in the apartment in close proximity to the crime." There was adequate testimony that the lamp was in the victims' apartment shortly before their deaths and that the defendant gave it to one of the witnesses in the first or second week thereafter.

---

[3] "THE TRIAL JUDGE ERRED IN EXCLUDING FROM EVIDENCE THE ANSWER TO THE QUESTION 'NOW LET ME ASK YOU, MR. HARRELSON, ARE YOU THE SAME GENTLEMAN THAT I RECALL READING ABOUT IN LIFE MAGAZINE'. The attention of this Honorable Court is respectfully directed towards Volume X Pages 1337 and 1338 of the trial transcript and claims that the refusal of the trial judge to allow defense counsel to attack the credibility of the Commonwealth's expert resulted in prejudice to the defendant.

"THE TRIAL JUDGE ERRED IN ADMITTING INTO EVIDENCE THE ANSWER TO THE QUESTION 'AND WHAT IF ANYTHING DID SHE TELL YOU'. Transcript Volume XIII, Page[s] 1715 and 1716. It is respectfully contended that this conversation relates to that which the witness allegedly had with the deceased and which does not come under any exception to the hearsay rule and constituted prejudicial error to the defendant."

The defendant argues in the next sentence "that the prosecution had earlier agreed with defense counsel that he would be advised of any material evidence the Commonwealth intended to introduce and this evidence [the lamp] was introduced in violation of this agreement." The lamp first became available to the prosecutor as evidence on the very day that it was marked for identification after the witness who brought it to court testified that the defendant had given it to her. Four days later, after an intervening holiday weekend, the second witness identified the lamp as having been in the victims' apartment, and it was then admitted as an exhibit. The record falls short of demonstrating that the prosecutor failed to comply with his agreement.

10. The final error which the defendant purports to argue in his brief relates to alleged improper argument by the prosecutor in his summation to the jury. The prosecutor asked the jury to consider whether one of the victims met her death in resisting the defendant's attempts to force her to commit an unnatural act on him. In this argument the prosecutor referred to the evidence that spermatozoa were found in the mouth of that victim, and to the evidence of the many injuries, other than the fatal stab wounds, to various parts of her body, and in particular to her knees, which injuries the medical expert had testified had been inflicted before the death of that victim.

The defendant made no objection and saved no exception to any part of the prosecutor's argument, and he asked for no special instructions to the jury thereon. We have held on numerous occasions that "[i]n a case tried subject to G. L. c. 278, §§ 33A-33G, an assignment of error not based on an exception brings nothing to this court for review." *Commonwealth* v. *Myers,* 356 Mass. 343, 346 (1969), and cases cited therein. *Commonwealth* v. *Underwood,* 358 Mass. 506, 509 (1970). *Commonwealth* v. *Foley,* 358 Mass. 233, 236 (1970). The absence of any objection or exception by the defendant in this matter means that he is not entitled to appellate review as of right. The defendant does not now complain of any action or ruling by the

judge, nor was the judge ever asked to make any ruling or to take any action regarding the prosecutor's argument.

However, even without the preservation of any right to ordinary appellate review, we are required to consider this matter as a part of the obligation imposed on this court by G. L. c. 278, § 33E, as amended through St. 1962, c. 453, and in "a case in which the defendant was tried on an indictment for murder in the first degree and was convicted of murder either in the first or second degree." Considering the situation under that mandate we conclude that the defendant is not entitled to any relief. The part of the prosecutor's argument of which the defendant complains did not exceed the limits of the inferences which the jury could draw, if they chose to do so, on all the evidence. The jury were not required to believe the defendant's testimony that on one or more prior occasions the victim had initiated such unnatural acts and that he had merely acquiesced therein, or to believe the defendant's account of his discovery of the two dead victims when he arrived at their apartment in the early morning hours of November 29, 1973.

11. In summary, we hold that with respect to those rulings on which the defendant saved exceptions, assigned errors and made them the subject of proper arguments in his brief, there was no error. On a review of the entire cases on the evidence and the law under G. L. c. 278, § 33E, we conclude that the defendant is not entitled to relief.

*Judgments affirmed.*