COMMONWEALTH *vs.* ROBERT FITZGERALD
(and a companion case[1]).

Suffolk. May 2, 1978. — September 20, 1978.

Present: HENNESSEY, C.J., QUIRICO, BRAUCHER, LIACOS, & ABRAMS, JJ.

*Identification. Practice, Criminal,* Directed verdict, Questioning by prosecutor, Argument by prosecutor, Instructions to jury. *Evidence,* Identification, Judicial discretion, Cross-examination.

Even though a witness at a criminal trial who had made extrajudicial photographic identifications of the defendants and statements implicating them in the crime testified affirmatively during the trial that the defendants were not the perpetrators of the crime, her extrajudicial identifications were not merely prior inconsistent statements but constituted substantive evidence which could be considered in determining whether motions for directed verdicts should be granted. [405–408]

Even though a witness at a criminal trial who had made extrajudicial photographic identifications of the defendants and statements implicating them in the crime testified affirmatively during the trial that the defendants were not the perpetrators of the crime, the admission of her prior identifications as substantive evidence did

---

[1] Commonwealth *vs.* Joseph Chisholm.

not violate the defendants' right of confrontation where she affirmed that she had made the earlier identifications and thus could be cross-examined concerning them [409]; nor were the defendants denied due process of law by the admission of the identifications as substantive evidence where the identifications were not made under suggestive conditions and where the defendants were given ample opportunity to discredit the identifications [409–410].

At a criminal trial, a witness's extrajudicial photographic identifications of the defendants, as well as her in-court testimony concerning identification, were sufficient to warrant the denial of the defendants' motions for directed verdicts even though the witness's testimony was inconsistent and contradictory. [410–411]

At a criminal trial, the judge did not err in allowing the prosecutor to question a witness concerning her fear of testifying against the defendants where, in the circumstances, the possibility that fear was the explanation for the witness's repudiation of her extrajudicial photographic identifications of the defendants and the contradiction of her earlier statements was clearly a permissible inference and where there was nothing to suggest that the prosecutor asked the questions in bad faith or that he was implying personal knowledge concerning evidence not in the record. [411–413]

At a criminal trial, a prosecutor's question to a defense witness as to whether her daughter, who was an eyewitness to the crime, had required twenty-four hour police protection after the incident was not improper, even though excluded, where there was basis for the question in the record and where the defendants could not have been prejudiced by the question since evidence similar to that being sought by the question had earlier been admitted without objection. [413–414]

At a criminal trial, a prosecutor's question to a defense witness as to whether she had been offered money to change her testimony was not improper where there was a factual basis for the question even though the bribe had not been directly linked to the defendants. [414–415]

At a criminal trial, the judge did not err in admitting evidence that a witness had found a bullet outside her door and had subsequently called the district attorney concerning the incident, with the implication that the witness had been threatened concerning her testimony, even though there was no evidence to link the threat to the defendants. [415–416]

At a criminal trial, remarks made by the prosecutor in his closing argument were neither improper nor prejudicial to the defendants. [416–424]

At a criminal trial, the judge's instructions to the jury, viewed in the context of the entire charge, were not erroneous. [424–425]

INDICTMENTS found and returned in the Superior Court on May 11, 1976.

The cases were tried before *Tamburello, J.*

The Supreme Judicial Court granted a request for direct appellate review.

*Margaret Hayman* for Joseph Chisholm.

*Judith H. Mizner* for Robert Fitzgerald.

*John A. Kiernan,* Assistant District Attorney, for the Commonwealth.

ABRAMS, J. After a jury trial, the defendants, Robert Fitzgerald and Joseph Chisholm, were convicted on indictments charging armed assault in a dwelling house with intent to commit a felony. G. L. c. 265, § 18A. They appeal their convictions pursuant to G. L. c. 278, §§ 33A-33G. Both defendants challenge the denial of their motions for directed verdicts on the ground that there was insufficient evidence to establish identity, and both contend that the prosecutor's examination of witnesses and his closing argument to the jury were improper and sufficiently prejudicial to require a reversal of the convictions. In addition, Fitzgerald contends that the trial judge erred in instructing the jury on the elements of the offense. We conclude that there was no reversible error and affirm the convictions.

We summarize the testimony at trial which is not now at issue. On May 5, 1976, Helen McInnis planned to meet friends for an evening out and arranged for Doris Skeffington (Doris) and Kelly Barrett (Kelly), both twelve years old, to stay with her two year old son, Joseph. Kelly fell asleep on a couch near a window approximately ten minutes before midnight. Doris watched a late movie and then retired to Joseph's bedroom.

McInnis returned to her apartment at approximately 5:30 A.M. on May 6. She asked her friends to wait in the car until she was safely inside and arranged to signal

them that she was all right by pulling the living room shade up and down. As she was signaling from inside the apartment, she leaned on the couch by the window. When she stood up, she realized that her hand was covered with blood.

She then ran to her son's bedroom where she found Doris and her son sleeping on the bed. There was blood all over the sheets. She ran back to the living room where she saw that the apartment was "a mess." She then saw Kelly lying on a loveseat beneath a bloodstained sheet. Kelly's arms were badly bruised, and she was covered with blood.

Kelly was taken to the hospital. She had sustained the type of skull fracture caused by a direct blow to the head. She had also suffered a fracture involving the bones of the left ear, and there was a laceration on the left side of her head and lacerations on her left arm.

An examination of the McInnis apartment revealed that the screen had been removed 'from one of the windows. Investigating officers also found a clip for an automatic pistol under the cushions of the couch by the window and a single loose bullet on this couch. There was human blood on the base of the clip and on the bullet.

1. *Identity.*

At the close of the Commonwealth's case both defendants moved for a directed verdict of not guilty on the ground that there was insufficient evidence that they committed the armed assault. These motions were denied, and the defendants saved exceptions. See *Commonwealth* v. *Kelley*, 370 Mass. 147, 149-150 (1976).

The blow to Kelly's head caused amnesia. She could not tell the police anything about what happened between the time she went to sleep and the time she was awakened by McInnis. At trial Kelly had not recovered her memory; she still could not recall anything concerning the assault. The primary witnesses on the issue of identification were Doris, who, because of Kelly's amnesia, was the only eyewitness to the crime and whose testimony is the primary

focus of dispute, and Joanne Desmond (Desmond), who testified that she heard Fitzgerald state during a fight that "I got your girlfriend's sister [Kelly] and now I am going to get your girlfriend and her friends."[2]

Doris was called as a witness for the Commonwealth. She testified that sometime after 2 A.M. on May 6, she heard a noise and looked out into the hall and living room from the bedroom. She saw three men coming through the window. One of them hit Kelly on the head; the men then played with the baby's toys and after about fifteen minutes left through the kitchen. Doris then went out into the living room and asked Kelly if she was all right. Kelly said she was, and Doris went back to sleep until she was awakened by McInnis.

On the issue of identification of the men, however, Doris's testimony during the trial was contradictory and inconsistent. She was highly uncooperative and was declared a hostile witness.

Doris testified that she knew both defendants prior to May 5. She stated that a sister of Fitzgerald was a friend of hers. She also testified that, although she did not know Chisholm's name prior to the assault, she knew who he was and had seen him around her neighborhood. At numerous points throughout her testimony, Doris stated that Fitzgerald and Chisholm were not the men who were in the McInnis apartment on the night of the assault. However, she also identified them as the attackers at other points in her testimony. When asked on direct examination whom she had seen coming through the window, Doris replied, "Joseph Chisholm." And, in response to a question whether Chisholm was one of the men whom Doris recognized in the apartment, Doris replied, "Yes." When the prosecutor asked her which of the men picked up a particular toy belonging to the baby, she

---

[2] A number of other witnesses testified concerning photographic identifications made by Doris and her various accounts of the events on the night in question.

answered, "Bobby," which was Fitzgerald's nickname
and which was a name by which Doris had referred to
him at trial. Finally, when asked whether any of the men
who had been in the apartment were present in the court
room, Doris replied, "Him and him," and apparently
pointed to the defendants.

Evidence that Doris had identified photographs of Chis-
holm and Fitzgerald as those of the men who were in the
apartment was also introduced.[3] After Kelly was taken to
the hospital on the morning of May 6, Doris went to the
police station to examine three books of photographs. She
testified that at this time she picked out a picture of
Chisholm as being one of the men in the apartment. Doris
then returned home. Later that same day she returned to
the police station to look through the books of photo-
graphs again. Doris testified that at this time she picked
out a photograph of Fitzgerald.

Finally, the prosecutor introduced prior statements by
Doris in which she stated that Fitzgerald and Chisholm
were in the apartment on the night of the assault on
Kelly and Doris's testimony before the grand jury in
which she admitted that she picked out photographs of
Fitzgerald and Chisholm.

The defendants first contend that Doris's photographic
identifications of the defendants, as well as her extrajudi-
cial statements, were merely prior inconsistent state-
ments and as such did not constitute substantive evidence
which could be considered in determining whether a mo-
tion for a directed verdict should be granted. See *Com-
monwealth* v. *Campbell*, 352 Mass. 387, 395 (1967). They
maintain that the other identification testimony present-

[3] Prior to trial, the defendants moved to suppress evidence of these
identifications. These motions were denied. The defendants do not
now challenge as error the denial of these motions. Grounds urged
before the trial judge but which are not argued or briefed before this
court are deemed waived. *Stranad* v. *Commonwealth*, 366 Mass. 847
(1974). *Commonwealth* v. *Ellis*, 356 Mass. 574, 575 (1970). Mass. R. A.
P. 16 (a) (4), as amended, 367 Mass. 919 (1975).

ed during the trial is insufficient to warrant a finding that they committed the assault on Kelly and thus that it was error to deny their motions for directed verdicts.

This court, however, has previously concluded that extrajudicial identifications are not always limited to the purpose of impeachment; rather, even when a witness is unable or unwilling to make an in-court identification, out-of-court identifications may be admitted as substantive evidence of guilt as long as the defendant's due process and confrontation rights are satisfied. *Commonwealth v. Swenson*, 368 Mass. 268, 272 n.3 (1975). *Commonwealth v. Torres*, 367 Mass. 737, 738-739 (1975). See *Commonwealth v. Howard*, 4 Mass. App. Ct. 476 (1976); *Commonwealth v. Day*, 4 Mass. App. Ct. 831 (1976). See also *Commonwealth v. McLellan*, 351 Mass. 335 (1966); *Commonwealth v. Nassar*, 351 Mass. 37, 42 (1966); *Commonwealth v. Locke*, 335 Mass. 106, 112 (1956). See generally Fed. R. Evid. 801 (d) (1) (C); 4 J. Weinstein & M. Berger, Evidence par. 801 (d) (1) (C) [01] (1977). As such substantive evidence, extrajudicial identifications may be considered in conjunction with other substantive evidence in evaluating the disposition to be made on a motion for a directed verdict. See *Commonwealth v. Swenson, supra* at 272 n.3; *Commonwealth v. Torres, supra* at 738-739.[4]

---

[4] The defendants also contend that, since during the trial the judge limited the use of Doris's testimony concerning the photographic identifications to impeachment purposes, under the law of the case, these identifications were not admissible as substantive evidence. We need not decide this question, however, because it is not clear that the judge, in fact, so limited Doris's testimony concerning her extrajudicial identifications. No limiting instructions were requested or given when this evidence was first admitted. In analyzing the motions for directed verdicts, the judge considered Doris's testimony concerning her photographic identifications, thus demonstrating that he considered it substantive evidence and that he did not think that it was covered by a general limiting instruction concerning prior inconsistent statements which he had given when a statement by Doris to the district attorney was introduced. The charge did not deal explicitly with Doris's testimony concerning her previous identification. Although the judge instructed the jury that prior inconsistent state-

The defendants further contend, however, that since in this case the witness testified affirmatively during the trial that the defendants were not the perpetrators of the crime, admitting the prior identifications as substantive evidence violated the defendants' due process and confrontation rights. Although Doris testified that the defendants were not present in the apartment on the night of the assault, she did not deny that she had previously identified photographs of them, nor did she state that she could not recall identifying the photographs. Rather, she affirmed that she had picked out photographs of Chisholm and Fitzgerald. Doris could thus be cross-examined concerning her earlier identifications, and, in fact, she was vigorously and thoroughly cross-examined concerning all the circumstances surrounding the identifications. We thus conclude that the admission of the identifications as substantive evidence did not violate the defendants' right of confrontation. See *Commonwealth* v. *Swenson, supra* at 272 n.3; *Commonwealth* v. *Torres, supra* at 738-739. See also *California* v. *Green,* 399 U.S. 149, 168-170 (1970) (statute); *Nelson* v. *O'Neil,* 402 U.S. 622 (1971). Cf. *Douglas* v. *Alabama,* 380 U.S. 415, 418-420 (1965).

The defendants suggest that the fact the witness Doris denied in court that the defendants were present at the apartment rendered the earlier identifications so unreliable that its admission as substantive evidence would deny the defendants due process of law. However, there is no claim before us that the photographic identifications were made under suggestive conditions, and, as discussed *supra,* the defendants had an opportunity to cross-examine and did thoroughly cross-examine Doris concerning the accuracy of these identifications. Where, as here, the identifications were not made under suggestive condi-

ments could only be used for their impeachment value, his actions during trial, and particularly those in connection with the motions for directed verdicts, indicate that he did not think that Doris's testimony dealing with her pretrial identifications constituted simply prior inconsistent statements.

tions and thus their admission was not precluded and where the defendants were given and, in fact, took advantage of, ample opportunity to expose to the jury any factors tending to discredit the identifications, we cannot conclude that they were so unreliable that they should not have been admitted as substantive evidence. See *Commonwealth v. Torres, supra*; 4 J. Weinstein & M. Berger, Evidence par. 801 (d) (1) (C) [01] (1977). Rather, the assessment of the reliability of the identifications in these circumstances was for the jury. See *Commonwealth v. Torres, supra*; *Lamoureux v. Commonwealth*, 362 Mass. 880 (1972); *Commonwealth v. Geraway*, 355 Mass. 433, 438-440, cert. denied, 396 U.S. 911 (1969).[5]

We turn now to an evaluation of the substantive identification testimony relating to each defendant to determine whether it was sufficient to warrant submitting the case to the jury. In connection with both defendants, the identification evidence included Doris's photographic identifications, her in-court references to each defendant's presence in the apartment, and her pointing to each defendant as one of the men she recognized. The photographic identification, coupled with the in-court testimony concerning identification, was sufficient to warrant submitting the case against each defendant to the jury.[6] See *Commonwealth v. Cobb*, 374 Mass. 514, 516 (1978); *Commonwealth v. Howard*, 4 Mass. App. Ct. 476, 483-484 (1976); *Commonwealth v. Day*, 4 Mass. App. Ct. 831 (1976).

The fact that Doris's testimony was inconsistent and contradictory does not render the evidence insufficient;

---

[5] The defendants also argue that using the photographic identifications as the sole basis for a jury verdict of guilty would violate their rights of due process and confrontation. However, since, as discussed *supra* and *infra*, there was other substantive evidence of guilt, we need not reach this issue. See Fed. R. Evid. 801 (d) (1) (C).

[6] In connection with the defendant Fitzgerald, the identification evidence also included Desmond's testimony concerning Fitzgerald's admission. See *Commonwealth v. Redmond*, 357 Mass. 333, 335-336 (1970).

all of her statements are entitled to be considered as probative evidence. See *Commonwealth* v. *Fiore,* 364 Mass. 819, 824 (1974); *Dirring* v. *United Staes,* 328 F.2d 512, 514 (1st Cir. 1964); *Zimberg* v. *United States,* 142 F.2d 132, 136-137 (1st Cir.), cert. denied, 323 U.S. 712 (1944). See also *Commonwealth* v. *Britt,* 358 Mass. 767, 770 (1971). Credibility is a question for the jury to decide; they may accept or reject, in whole or in part, the testimony presented to them. *Commonwealth* v. *Hoffer,* 375 Mass. 369, 377 (1978). *Commonwealth* v. *Amazeen,* 375 Mass. 73, 80 n.5 (1978). *Commonwealth* v. *Fiore, supra* at 824. *Commonwealth* v. *Holiday,* 349 Mass. 126, 129 (1965). The prior identifications and those made in court were fully probative despite contradictions in the testimony. There was no error in the denial of the motions for directed verdicts.

2. *Prosecutor's Questions to Witnesses and Closing Argument.*

The defendants contend that a number of the prosecutor's questions to witnesses and a number of his remarks in his closing argument were improper and so prejudicial as to require a new trial. A contention that runs through most of their arguments concerning these challenged actions is that they were improper because they dealt with and emphasized fear as the factor that explained the inconsistencies and contradictions in the testimony of the witnesses, particulary Doris.[7] However, in general, questions and arguments concerning a witness's fear in testifying are not improper per se. They would be improper only if there were some ground, other than that they dealt with fear, for finding impropriety.[8]

---

[7] The questions and arguments concerning fear in this case were concerned with general fear as an influence on testimony; they were not directed to issues of tampering with witnesses or intimidation of witnesses.

[8] For example, questions concerning fear which were asked in bad faith or arguments dealing with fear when there was no basis in the record for inferring fear would be improper. See *Commonwealth* v.

A. *Examination of Witnesses.*

(1) *Doris.*

On direct examination, after Doris testified that the defendants did not look like the men in the apartment, the prosecutor asked, "Are you afraid of something Doris?" The judge allowed the question, and the defendants objected and excepted. On redirect, after Doris testified that the defendants were not Kelly's attackers, the prosecutor asked her what she was afraid of. The question was allowed, and the defendants objected and excepted. Doris responded, "I am not afraid of nothing." The prosecutor then asked, "Are you afraid today?" Doris replied, "No. What should I be ascared of?" The defendants argue that these questions were improper because there was no evidence at the trial supporting the inference that Doris was afraid and, in particular, any inference that fear motivated her repudiation of the photographic identifications and of the statements to the district attorney was nullified by her explanation that her earlier identifications were mistaken because of her limited opportunity to view the assailants. The defendants also maintain that the asking of these questions implied that the prosecutor possessed personal knowledge of matters not in evidence.

In general, questions concerning a witness's fear of testifying are appropriate in the judge's discretion. *Commonwealth* v. *White*, 367 Mass. 280, 284 (1975). There was affirmative evidence in the record demonstrating fear on the part of Doris: there was testimony that she had been paralyzed by fear on the night of the crime, that she had been hysterical the next morning, that she had initially failed to identify Fitzgerald because she was afraid, and that she had not returned to her home for weeks following the crime. Moreover, the repudiation of her photographic identifications and the contradiction of her earlier statements to the district attorney required some

*Hoffer*, 375 Mass. 369, 379 (1978); *Commonwealth* v. *White*, 367 Mass. 280 (1975); *Commonwealth* v. *Festo*, 251 Mass. 275, 282 (1925).

attempt at explanation. The prosecutor was not bound by
Doris's explanation of her testimony. Particularly on the
record in this case, the possibility that fear was the expla-
nation was clearly a permissible inference and justified
the questions. See *Commonwealth* v. *Hoffer*, 375 Mass.
369, 379 (1978); *Commonwealth* v. *White, supra; Common-
wealth* v. *Festo*, 251 Mass. 275, 282 (1925). Finally, there
is thus no intimation that the prosecutor asked the ques-
tions in bad faith or that he was implying personal knowl-
edge concerning evidence not in the record. See *Common-
wealth* v. *Barnett*, 371 Mass. 87, 96 (1976), cert. denied,
429 U.S. 1049 (1977), *Commonwealth* v. *White, supra* at
284-285. The asking of these questions was not improper;
and to the extent that the defendants' argument chal-
lenges the allowance of these questions by the judge,
there is no showing of an abuse of discretion.

(2) *Mrs. Skeffington.*

Mrs. Skeffington, Doris's mother, was called as a wit-
ness for the defense and was a key witness in the defense
effort to discredit Doris's initial photographic identifica-
tions. The thrust of her testimony was that at the time of
the identifications Doris was tired and unsure and was
badgered into going to the police station by her father.
Mrs. Skeffington's testimony also minimized the extent
of Doris's fear, and she stated that she herself was not
afraid. At this point the prosecutor sought to impeach
Mrs. Skeffington by showing actions inconsistent with
not being afraid and by demonstrating bias. He asked
Mrs. Skeffington, "Isn't it true that your daughter had to
be given 24-hour police protection?" The defendants ob-
jected. The judge excluded the question and directed the
jury to disregard it. However, he denied the defendants'
motions for mistrials. The prosecutor then started to ask,
"Isn't it a fact you were offered money to change your
testimony in this case?" The question was cut off in mid-
sentence by a defense objection. After considering the
matter over the lunch hour, the judge excluded the ques-
tion. The defendants contend that the first question was

improper because there was no basis for it and that the second question was improper because the alleged bribe could not be linked to the defendants.

There was no showing that the prosecutor asked the first question in bad faith, implying the truth of a proposition he knew to be false.[9] Thus, although the judge could in his discretion exclude this question, the asking of the question was not improper. See *Commonwealth* v. *Barnett*, 371 Mass. 87, 96 (1976), cert. denied, 429 U.S. 1049 (1977); *Commonwealth* v. *White*, 367 Mass. 280, 284-285 (1975). Moreover, an officer investigating the case testified that after Doris had made the identifications she stayed for approximately three days with him and his wife, also a police officer, since they were assigned to watch her. He further testified that Doris went to New Hampshire after her stay with him. Doris stated that she had stayed with the officer for about five days and that she then went to stay in New Hampshire for two weeks. Since this evidence, which was similar to that which was sought through the excluded question, was admitted without objection, the defendants could not have been prejudiced in any event through the asking of the question. See *Commonwealth* v. *Hoffer*, 375 Mass. 369, 372 (1978); *Commonwealth* v. *Hanley*, 337 Mass. 384, 394-395, cert. denied, 358 U.S. 850 (1958). There was no error.

The question concerning the attempted bribing of Mrs. Skeffington was also not asked without a factual basis.[10] The fact that the bribe was not directly linked to the defendants did not render the question improper; rather any attempt to pay a witness to change testimony would be relevant to that witness's bias in testifying. See *Com-*

[9] Although the Commonwealth did not make an offer of proof concerning this question, the record of the pretrial hearings indicates that Doris had been placed under police protection and that later Doris had been taken out of the State because her parents were in fear for her.

[10] As the prosecutor pointed out during a bench conference concerning this question, during the hearing on the motions to suppress the identifications, Mrs. Skeffington stated that she was offered money.

*monwealth* v. *Myers,* 356 Mass. 343, 346-347 (1969); *Commonwealth* v. *Min Sing,* 202 Mass. 121, 128 (1909). In fact, when a similar question was asked by the prosecutor at the hearing on the motions to suppress, the judge indicated that he considered the question relevant; it was only after evaluating the question in light of the events at trial that he concluded that its relevance was outweighed by its prejudicial impact. Thus, the asking of this question did not constitute improper conduct. See *Commonwealth* v. *Cheek,* 374 Mass. 613, 617 (1978).

Shortly after he asked the two questions discussed *supra,* the prosecutor, again in an attempt to impeach Mrs. Skeffington's denials of fear, questioned her concerning her finding a bullet outside her door and her subsequent telephone call to the district attorney concerning this incident. Over the defendants' objections and exceptions, the judge admitted the evidence. The defendants contend that this line of questioning was improper because it was asked in bad faith without a basis and because the incident was not linked to the defendants.

There is, however, no showing that the questions were asked merely to imply the truth of a proposition which the prosecutor knew to be false.[11] The evidence concerning this incident, with its strong implication that Mrs. Skeffington was being threatened concerning her testimony, did not become improper simply because it was not linked to the defendants. The existence of a threat by anyone concerning a witness's testimony would be relevant to the witness's motive, and the prosecutor never argued or implied that the threat was made by the defendants. See *Commonwealth* v. *Myers,* 356 Mass. 343, 346-347 (1969); *United States* v. *Burton,* 525 F.2d 17, 19 (2d Cir. 1975). The asking of the questions was not improper. See generally *Commonwealth* v. *Cheek,* 374 Mass.

---

[11] Testimony at the hearing concerning the motions to suppress established that the bullet incident had occurred and that Mrs. Skeffington had notified the district attorney concerning it.

613, 617 (1978). To the extent that the defendants are arguing that the evidence should not have been admitted by the judge, there is no showing of an abuse of discretion. See *Commonwealth* v. *White*, 367 Mass. 280, 284-285 (1975).

B. *Prosecutor's Closing Argument.*

The defendants challenge numerous remarks made by the prosecutor in his closing argument as improper. However, no objection or exception was taken and no request for specific instructions was made concerning any of these arguments. In these circumstances, the defendants are not entitled to appellate review of these allegedly improper remarks as of right. *Commonwealth* v. *Baptiste*, 372 Mass. 700, 712 (1977). *Commonwealth* v. *Earltop*, 372 Mass. 199, 203 (1977). However, we may review such alleged errors to determine if there was a substantial risk of a miscarriage of justice. See, e.g., *Commonwealth* v. *Shelley*, 374 Mass. 466, 469 (1978); *Commonwealth* v. *Earltop*, *supra* at 203-204.

In closing argument, counsel may argue the evidence and the fair inferences from the evidence. *Commonwealth* v. *Hoffer*, 375 Mass. 369, 378 (1978). *Commonwealth* v. *Burke*, 373 Mass. 569, 574-575 (1977). In analyzing whether an improper remark is prejudicial or presents a risk of a miscarriage of justice, the remark must be considered in the context of the prosecutor's entire argument, as well as in light of the judge's instruction to the jury and the evidence at trial. See *Commonwealth* v. *Earltop*, 372 Mass. 199, 203-204 (1977); *Commonwealth* v. *MacDonald (No. 1)*, 368 Mass. 395, 400-402 (1975); *Commonwealth* v. *Nordstrom*, 364 Mass. 310, 316 (1973); *Commonwealth* v. *DeChristoforo*, 360 Mass. 531, 536-539 (1971).

(1) *Misstatements of Evidence and Law.*

During his closing argument, the prosecutor stated, "You saw [fear] in everyone of the witnesses all around this case. . . . And you heard every single witness that the Commonwealth put on testify about fear." Immediately

following these remarks the prosecutor referred to the testimony of each of the Commonwealth's witnesses, except the two expert witnesses. The defendants contend that the introductory remarks made by the prosecutor were misstatements of the evidence and that, as such, they were improper. See *Commonwealth* v. *Stone*, 366 Mass. 506, 515 (1974); *Commonwealth* v. *Nordstrom, supra* at 315-316; *Commonwealth* v. *Balakin*, 356 Mass. 547, 550-551 (1969). While the remarks were not quite literally correct, they were a substantially accurate generalization concerning the testimony of the major witnesses presented by the Commonwealth who were the only witnesses apparently referred to by both of these remarks.[12] All of the Commonwealth's witnesses, with the exception of the two expert witnesses who were expressly excluded from the generalization during the subsequent summary of testimony, testified concerning fear, exhibited fear, or testified to facts from which fear could be inferred. Moreover, the references to the Commonwealth's witnesses' testimony, which followed the challenged remarks and the accuracy of which are not now directly challenged by the defendants, clarified the meaning of the introductory remarks, thus negating the possibility that the slight inaccuracy of the remarks might have misled the jury. These remarks were thus not improper. See *Commonwealth* v. *Coleman*, 366 Mass. 705, 714-715 (1975); *Commonwealth* v. *Martin*, 357 Mass. 190, 193 (1970).

During his argument, the prosecutor mentioned Doris's pretrial identifications and her prior statements identifying the defendants, stressed that these were "positive" identifications, and asked the jury to "zero right in on" them. The defendants argue that these statements constituted an attempt to misstate the law by requesting the jury to use the photographic identifications and the

---

[12] After the first remark concerning the fear of all the witnesses, the prosecutor noted the absence of any evidence of fear in the testimony of a number of defense witnesses.

prior statements as substantive evidence when their admission was limited to impeachment and that the remarks were therefore improper. See *Commonwealth* v. *Killelea,* 370 Mass. 638, 644-649 (1976). However, when the prosecutor's remarks are read in the context of his argument, they referred not to whether the evidence involved was substantive, but rather to whether Doris was certain when she made the photographic identifications and the earlier statements identifying the defendants.[13] A characterization of these identifications as "positive" was warranted from the evidence. The remarks were thus proper.

(2) *Excluded Evidence.*

The prosecutor also stated in his closing that "Doris Skeffington, John Ridlon and Mrs. Skeffington told you that young Doris had to go to live with police officers. Fear. And after living with the police officers for a while, she left the Commonwealth of Massachusetts, she left her home. Here it is again, fear. . . . [Mrs. Skeffington was] the one who told you that her daughter couldn't come back to Charlestown—for how long—two or three weeks. There it is, the fear." During the trial the judge had excluded a question concerning the purpose of Doris's trip to New Hampshire and one concerning twenty-four hour police protection. The defendants argue that the prosecutor's statements improperly asked the jury to speculate concerning excluded evidence. See *Commonwealth* v. *Burke,* 373 Mass. 569, 574-575 (1977); *Commonwealth* v. *Nordstrom,* 364 Mass. 310, 316 (1973). However, each of the statements recounting the evidence in this portion of the argument was correct. One permissible inference from this evidence that Doris had stayed with police officers for a period of time and that she had then left the State was that there was fear for Doris's safety. See *Com-*

[13] In addition, as discussed *supra,* the photographic identifications could be admitted as substantive evidence and it is not clear that the judge limited their admission to impeachment.

*monwealth* v. *Hoffer*, 375 Mass. 369, 379 (1978). There was thus evidence, other than that which had been excluded, from which the inference of fear suggested by the prosecutor could be drawn. The remarks were therefore not improper. Cf. *Commonwealth* v. *Burke, supra* at 574-575; *Commonwealth* v. *Nordstrom, supra* at 316.

The prosecutor also stated that "McInnis, she told you she sleeps under the window. And she told you why she sleeps under the window." During the trial the judge had struck McInnis's explanation of why she slept under the window. The defendants contend that this argument which relied on excluded evidence was improper. This argument was clearly improper. However, this argument was not so prejudicial as to constitute a risk of a miscarriage of justice. The thrust of the prosecutor's statement was that McInnis was afraid in her neighborhood. Other testimony given by McInnis would have supported this inference of fear: she kept her doors and windows locked and she asked friends to wait after dropping her off until she signaled them that she was safely in her apartment. Since other evidence was available from which the prosecutor could have suggested the same inference, the use of the excluded evidence to make his point could not have seriously prejudiced the defendants. Moreover, any prejudice resulting from this remark was sufficiently negated by the judge's charge to the jury. He instructed them that the arguments of counsel were not evidence, that it was for the jury to determine the facts, that the collective recollection of the jury concerning the facts controlled, and that if counsel made statements concerning the evidence which were not in accord with the collective recollection, such statements should be disregarded. See *Commonwealth* v. *Burnett*, 371 Mass. 13, 19 (1976); *Commonwealth* v. *Coleman*, 366 Mass. 705, 713-714 (1975); *Commonwealth* v. *Stone*, 366 Mass. 506, 515-516 (1974); *Commonwealth* v. *Balakin*, 356 Mass. 547, 550-551 (1969). See also *Commonwealth* v. *Cepulonis*, 374 Mass. 487, 500 (1978).

(3) *Arguments With No Basis in the Evidence.*

The prosecutor also stated that "[y]ou were at the projects and, unfortunately, that is a manifestation of our society. And it's spelled fear. You saw it, you were there. And from your own common experience you know the fear that is in those projects. And it is that common experience that I'm asking you to get down into your conscience so that you know from what you heard here in the courtroom and what you saw that those are the two men that broke into that apartment and beat Kelly Barrett." The defendants argue that there was no evidence relating to a general atmosphere of fear in the housing projects and that this remark was therefore improper. See *Commonwealth* v. *Shelley*, 374 Mass. 466, 470 (1978); *Commonwealth* v. *Redmond*, 370 Mass. 591, 594-597 (1976). However, as noted in this portion of the argument, the jury had taken a view of the projects, and they were entitled to rely on what they had seen on the view in reaching their verdict. Also as noted in the prosecutor's argument, it was proper for the jury to take into consideration their common knowledge concerning the projects. See *Commonwealth* v. *McColl*, 375 Mass. 316, 323 (1978). An inference that there was fear in these projects could have been permissibly drawn from the observations during the view and the jury's common knowledge.[14] The remark was therefore not improper.

The prosecutor remarked, "Mrs. Skeffington can say to you, 'Hey, look, I've got to live there.' Little Doris can give you all kinds of stories. Well, I'm not sure about that. And then she can say, 'I've got to live there.' " The defendants argue that since neither Mrs. Skeffington nor Doris testified along these lines, there was no evidence in the record which would warrant this remark. However, the prosecu-

---

[14] Other evidence introduced during the trial, for example, McInnis's testimony, discussed *supra*, indicating that she felt fear in the neighborhood, further supported the drawing of an inference that there was fear in the projects.

tor's statement was obviously a rhetorical remark, the substantive implication of which was that fear was a factor which explained the testimony of Doris and Mrs. Skeffington. Rhetorical statements are permissible in argument. *Commonwealth* v. *Brownell*, 145 Mass. 319, 323 (1887). And, as can be seen from the preceding discussion, the inference that Doris's and Mrs. Skeffington's testimony could be at least partially explained by fear was permissible on the evidence. The remark was not improper.

The defendants also object to the prosecutor's statements that Kelly did not come back to the projects after the assault because of fear and that her family thereafter moved to Malden for the same reason. They contend that there was no evidence that these actions were motivated by fear and that, in fact, the remarks were contrary to the testimony of Kelly's mother that Kelly did not come back because a physician recommended that she stay in a different environment for a period of time to see if she would regain her memory. The facts that Kelly left the area and that her family subsequently moved permanently suggest that there was some fear for Kelly. Such an inference is not necessarily inconsistent with the testimony that Kelly left the area for a while in an attempt to regain her memory. Residual fear from the assault might be an additional reason for her leaving the area, and it would be reasonable to infer that fear engendered by the attack would adversely affect her ability to regain her memory in the surroundings of the attack. The argument was not improper.

(4) *Statements Implying Independent Knowledge of the Facts.*

The defendants also challenge several remarks made by the prosecutor on the grounds that they were statements of personal opinion concerning the guilt of the defendants and that they conveyed the impression that the prosecutor possessed knowledge of their guilt independent from the evidence at trial. See *Commonwealth* v. *Earltop*, 372 Mass. 199, 202-203 (1977); *Commonwealth* v.

*Nordstrom,* 364 Mass. 310, 313 (1973); *Commonwealth* v. *DeChristoforo,* 360 Mass. 531, 536-537 (1971). The prosecutor remarked a number of times that the "hidden," "disguised," and "buried" truth was that Chisholm and Fitzgerald beat Kelly and that they were guilty. These remarks, however, were made in connection with references to the evidence at trial, and particularly in connection with discussions of Doris's contradictory testimony. Thus, when read in context, the remarks did not constitute statements of personal opinion implying independent knowledge; rather they were made in an attempt to argue that Doris's in-court statements identifying the defendants were more credible than those in which she denied that the defendants were present in the apartment. While the remarks were worded fairly strongly, when read in this context, they were within the permissible limits of argument. See *Commonwealth* v. *Earltop, supra* at 202-203. See also *Commonwealth* v. *Coleman,* 366 Mass. 705, 713-714 (1975).

The prosecutor also urged the jury not to be diverted by the "lies," "con-jobs," "made up testimony," or "concocted stories" of Doris and the defendants. While the words chosen may, perhaps, have been strong, the prosecutor was primarily arguing through these references that Doris's statements denying that the defendants were Kelly's assailants and the defendants' alibi testimony were not credible. Challenging the credibility of witnesses in such a manner is permissible if the characterization of their testimony is supported by the evidence. See *Commonwealth* v. *McColl,* 375 Mass. 316, 323-324 (1978); *Commonwealth* v. *Cheek,* 374 Mass. 613, 618-619 (1978) *Commonwealth* v. *Stone,* 366 Mass. 506, 516 (1974). The completely contradictory statements presented at trial concerning the identity of the assailants, which was the central issue in the case, warranted the inference that at least one of the versions concerning who was in the apartment was false and thus permitted the prosecutor to argue that the version denying that the defendants were the assailants

was the false story. See *Commonwealth* v. *MacDonald (No. 1)*, 368 Mass. 395, 401 (1975). The remarks by the prosecutor thus did not constitute expressions of personal opinion nor did they imply that he had independent knowledge of the defendants' guilt. The references did not exceed the permissible limits of argument.

The prosecutor also stated that "I ask you to consider ... [fear] when you think about the testimony of Mrs. Doris Skeffington. She's the one who called the District Attorney's office about the bullet." The defendants argue that this reference to the bullet incident was an attempt to link it to the defendants, and contend that this remark implied knowledge independent of the evidence. However, the prosecutor did not imply that the defendants were responsible for the incident. Rather, his reference to the bullet was in the context of his contention that general fear explained, at least in part, the testimony of Mrs. Skeffington.

(5) *Inflammatory Appeals.*

The prosecutor stated, "We heard from Kelly Barrett herself. And you all have those pictures. You take a good look at them, please. And you look at her head. And I ask you to never let that happen again, never. And the way you do that is by sifting through the evidence that you heard, taking the truth out of it—its buried, it's there." He later continued, "And you people, you must seek out the truth and say they're guilty, and I ask you this for several persons: for Kelly Barrett, for all the other Kelly Barretts in the world. They have looked to Suffolk County to say that when the facts are given, even if they are hidden, cloaked in the con-jobs, when the facts are given you'll return a verdict of guilty." Finally, he later concluded, "Please, ladies and gentlemen, don't decide this case on sympathy for either Kelly Barrett but not for these two. Decide it on the facts. Because if you decide it on anything other than the facts—the testimony that you've been given—then you would, in effect, condone the beating of Kelly Barrett." The defendants maintain that

these remarks were improper because they constituted appeals to convict the defendants on the basis of sympathy for the victim and irrelevant general considerations. See *Commonwealth* v. *Hoffer*, 375 Mass. 369, 379 (1978); *Commonwealth* v. *Burnett*, 371 Mass. 13, 19 (1976); *Commonwealth* v. *MacDonald (No. 1)*, 368 Mass. 395, 402 (1975); *Commonwealth* v. *Belton*, 352 Mass. 263, 270, cert. denied, 389 U.S. 872 (1967). We disagree. See *Commonwealth* v. *Johnson*, 374 Mass. 453, 459-460 (1978).

Even assuming that the remarks were improper, they were not so prejudicial as to constitute a substantial risk of a miscarriage of justice. Any force in the statements was mitigated by the fact that each such remark was followed by a request to decide the case on the facts. Further, any prejudice resulting from these remarks was cured by the judge's charge to the jury in which he instructed them that the arguments of counsel were not evidence, that a verdict must be based only on facts found from the evidence beyond a reasonable doubt, and that the evidence, not sympathy, must form the basis of their decision. See *Commonwealth* v. *MacDonald (No. 1)*, *supra* at 402. See also *Commonwealth* v. *Belton*, *supra* at 270.

3. *Charge to the Jury*.

During his charge, the judge instructed the jury, "So, in this particular case, there's no question that somebody injured this child. In this case there's no question, I believe, on anybody's part that that child was injured and there was an assault and battery. So, on the element here of assault and battery, there was an assault and battery by someone." Later he stated, "So, in this case, the assault upon Kelly Rose Barrett by means of a dangerous weapon—I believe that by the evidence it is not contested here, but it is for you to say." He also said, "So that in this case there appears to be no question that someone did enter this home and strike this child and commit an assault and battery. But the most important part of this case is if you find those elements—of course, if you don't find those elements, then, no matter who did it, the crime

is not committed—but if you find that the elements are there, the question is whether these defendants did it." Fitzgerald did not object to these portions of the charge, nor did he request an instruction clarifying them.[15] However, he now contends that these instructions improperly invaded the province of the jury by removing from their consideration some of the essential elements of the offense. See *Commonwealth* v. *Jones*, 372 Mass. 403, 409-410 (1977); *Commonwealth* v. *Pauley*, 368 Mass. 286, 291, appeal dismissed, 423 U.S. 887 (1975).[16]

In determining whether instructions to the jury were so erroneous as to create a substantial risk of miscarriage of justice, the challenged statements are to be viewed in the context of the remainder of the charge. *Commonwealth* v. *Stewart*, 375 Mass. 380, 388 (1978). *Commonwealth* v. *Whooley*, 362 Mass. 313, 319, 320 (1972). Two of the three challenged statements specifically contained directions to the jury that they must find the facts; thus any implications that the judge was instructing the jury that certain elements of the crime had been established were mitigated. See *Commonwealth* v. *Earltop*, 372 Mass. 199, 203 (1977). Moreover, the judge charged the jury concerning each of the elements of the offense; he stated that they alone were the triers of fact and that for a verdict of guilty to be returned they must find facts establishing each element of the offense beyond a reasonable doubt, and he also instructed them that any statements concerning the evidence which he made and which did not coincide with their recollection of the facts were to be disregarded. In these circumstances, we cannot conclude that the judge removed essential elements of the crime from the jury's consideration. There was no error.

*Judgments affirmed.*

[15] In fact, during a bench conference following the charge, the judge remarked, "I think we'll all agree that this is a matter of identification." Counsel for Fitzgerald did not disagree; rather, he replied, "I think that's essential."

[16] Since this assignment of error is not based on an exception there is nothing before this court for review. See *Commonwealth* v. *Concepcion*, 362 Mass. 653, 654 (1972).