## COMMONWEALTH vs. JASON CLEMENTS.

No. 99-P-158.

Suffolk. March 13, 2000. - May 10, 2001.

Present: ARMSTRONG, C.J., BROWN, PORADA, DREBEN, & DUFFLY, JJ.[1]

Further appellate review granted 434 Mass. 1106 (2001).

*Grand Jury. Practice, Criminal,* Grand jury proceedings, Deliberation of jury. *Evidence,* Testimony before grand jury, Hearsay, Prior inconsistent statement, Identification, Joint enterprise, Relevancy and materiality. *Identification. Joint Enterprise. Constitutional Law,* Confrontation of witnesses.

At the trial of indictments arising from a fatal shooting, the judge correctly admitted prior inconsistent grand jury testimony of a witness to the shooting as substantive evidence under principles stated in *Commonwealth* v. *Daye*, 393 Mass. 55 (1984), where an out-of-court photographic identification of the defendant by the witness provided the additional evidence needed for purposes of permitting the admission of the grand jury testimony and, when considered together with the grand jury testimony, was sufficient to warrant the submission of the issue of identification to the jury. [510-521] DUFFLY, J., dissenting. PORADA, J., dissenting.

At the trial of a murder indictment, there was sufficient evidence for the jury to determine beyond a reasonable doubt that the defendant was a participant in a joint venture. [521-523] DUFFLY, J., dissenting.

Where the defendant and another were tried on murder indictments under the theory of individual liability and under a theory of joint venture, the conviction of only the defendant of murder in the second degree by reason of joint venture and the acquittal of the other did not require that the verdict be set aside. [523]

No substantial risk of a miscarriage of justice arose from the judge's admitting evidence that the defendant sold drugs at a certain location, where the evidence was relevant to show hostility among the defendant, the victim, and two others, all four of whom were selling drugs at the same location, and where it was unlikely that such evidence would have affected the jury in determining whether a far more serious crime — murder — had been committed by the defendant. [523]

There was no merit in a contention by the defendant in a criminal case that the trial judge coerced a verdict from the jury in violation of G. L. c. 234, § 34. [524]

---

[1]After circulation of this opinion to the other Justices of the Appeals Court the panel was expanded. See *Sciaba Constr. Corp.* v. *Boston*, 35 Mass. App. Ct. 181, 181 n.2 (1993).

At a criminal trial, the judge did not invade the autonomy of the jurors' deliberations by conducting an individual voir dire with each juror in response to receiving a note from the jury stating that a juror had allegedly made a biased statement, where the record indicated that the judge was not coercive, did not influence their judgment, and in no way intimated to the jurors that she agreed or disagreed with their positions. [524]

The absence of a criminal defendant during the judge's questioning of the jury on a claim of bias did not constitute reversible error, where the defendant was represented zealously by counsel, and there was no indication that the proceedings would have been different had the defendant been present. [524-525]

INDICTMENTS found and returned in the Superior Court Department on December 17, 1996.

The cases were tried before *Margot Botsford*, J. , and a motion for a new trial was heard by her.

*Rosemary Curran Scapicchio* (*Melissa D. Carter* with her) for the defendant.

*Paul B. Linn*, Assistant District Attorney, for the Commonwealth.

DREBEN, J. On January 30, 1995, Gregory Tillery was fatally shot on Harvard Street in the Dorchester section of Boston. At the crime scene, near the body, police found bullets and spent shell casings from both a nine millimeter and a .380 caliber weapon. The Commonwealth's theory of the crime was that the defendant and one Kenneth Mattox were the culprits. Both men were charged with murder, armed assault with intent to murder, and possession of a firearm without a license. After a joint trial, Mattox was acquitted on all charges, but the defendant was convicted of second degree murder as a joint venturer, of armed assault with intent to murder as a principal,[2] and illegal possession of a firearm. In his appeal from his convictions and from the denial of his motion for a new trial, the defendant raises numerous claims, including: (1) it was error to admit the grand jury testimony of a witness, Sakoya Willis, as substantive evidence without meeting the requirements for such admission as set forth in *Commonwealth* v. *Daye*, 393 Mass. 55, 74-75 (1984); (2) the defendant's conviction of second degree murder

[2]The charge of armed assault with intent to murder was based on an assault against Sakoya Willis, the major witness at trial.

as a joint venturer cannot stand in view of Mattox's acquittal of that charge; and (3) the judge committed several errors in regard to the jury's deliberations. We affirm the defendant's convictions.

1. *Admissibility of grand jury testimony and sufficiency of identification evidence.* Since the sufficiency of the evidence identifying the defendant as one of the assailants depends on the admissibility of the grand jury evidence of Sakoya Willis, the only known eyewitness to the shooting, we will first focus on that issue leaving other relevant facts to the discussion of the defendant's remaining claims.

At trial, Willis, a friend of Gregory Tillery, testified as follows. In January, 1995, Willis "hung out" and sold drugs with Tillery on Harvard Street. Other persons also sold drugs in the same area, including the defendant and Mattox, who were often together. Willis had known the defendant since childhood, but at the time of the incident some problems had arisen between him and the defendant.[3] On the afternoon of the fatal shooting, Willis, Tillery, the defendant, and Mattox spent considerable time on Harvard Street. At one point the defendant and Willis exchanged certain "looks," and the defendant left the scene. Soon thereafter, Mattox walked by Willis and Tillery singing a portion of "Scar Face," a song which Willis knew was about a "guy's best friend dying." After hearing the verse, Willis and Tillery moved away from Mattox along Harvard Street in the direction of Greenwood Street.

Later that evening, at about six o'clock, while Willis was standing near the corner of Harvard Street and Greenwood Street with Tillery next to him on a bike, somebody started shooting at them from Harvard Street at a distance of about ten feet. Willis did not recognize the attacker, a male whom he described as being about six feet tall, wearing a "hoodie," and holding what looked like a silver .380 caliber automatic.

Upon hearing the shots — approximately four in number — Willis ducked behind a car but was pursued by the attacker. When the shooting stopped, he turned around and saw the attacker about ten feet behind him on Harvard Street. He appeared to be cocking his gun trying to unjam it. A "couple of

---

[3]When asked what the problem was, Willis answered, "I don't know what it was over, actually. Stupidness, basically . . . It was, I guess, drugs, maybe."

seconds" after Willis saw his pursuer, he heard four or five more gunshots. He then ran home via Standish Street,[4] crossing a railroad bridge. From the top of the bridge he saw two people running but could not identify them.

When pressed by the prosecutor, Willis acknowledged that prior to trial, at a police station on March 9, 1995, he had, at the behest of Tillery's family, identified the defendant as the assailant from an array of eight photographs, and had dated and signed his name on the back of the photograph. He also acknowledged that he had given a taped statement to the police and that he had identified the defendant as the shooter when he testified before the grand jury in November, 1996. Willis admitted that his memory was better at the time he had spoken to the police and made the identification. At that time he thought it was the defendant who started shooting at him and the victim. He thought he was telling the truth both when he went to the police in March and when he subsequently testified to the same effect before the grand jury in November, 1996. He stated, "Originally, I thought it was Mr. Clements; but I'm not absolutely sure. It was dark."

Although Willis testified that he did not see anyone with the defendant, when confronted with his grand jury testimony, he acknowledged that he had testified before the grand jury that Mattox had been with the defendant at the time of the shooting, and that from the railroad bridge he had seen the defendant and Mattox running down Standish and taking a right on a street parallel to Harvard Street.

The photograph of the defendant, acknowledged by Willis as having been identified by him as the assailant, was admitted as an exhibit at trial. See *Commonwealth* v. *Daye*, 393 Mass. at 61 & n.9. See also Proposed Mass.R.Evid. 801(d)(1)(C).

At the conclusion of Willis's testimony, over objection, the judge permitted the Commonwealth to read to the jury excerpts of Willis's grand jury testimony that were inconsistent with his

---

[4]On one side of Harvard Street the perpendicular intersecting street is called Standish Street and on the other side of Harvard Street it is called Greenwood Street. See appendix.

testimony at trial.[5] The jury were instructed that they could treat the grand jury testimony as substantive evidence.

We turn to the pivotal case of *Commonwealth* v. *Daye*, 393

---

[5]The following is the major portion of Willis's grand jury testimony that was read to the jury.

*Q.*: "When you say 'someone came walking in the middle of the street,' who came walking in the middle of the street?"

*A.*: " 'Jay.' "

*Q.*: "Jason Clements?"

*A.*: "Yes."

. . .

*Q.*: "Was he headed towards you?"

*A.*: "Yes."

*Q.*: "When you saw Jason Clements back on the street, how far away from you was he the first time you saw him?"

*A.*: "I'd say about here to that chair over there."

*Q.*: "You're indicating about 20 feet, for the record?"

*A.*: "Yes."

*Q.*: "Was he walking towards you?"

*A.*: "Yes."

*Q.*: "Where was Gregory Tillery in relation to where you were?"

*A.*: "He was standing right next to me."

*Q.*: "What happened as you saw Jason Clements walking towards you?"

*A.*: "He took a quick turn, pulled out a gun, and started shooting."

*Q.*: "How far was he from you and Gregory Tillery when he started shooting?"

*A.*: "Like maybe from here to that table."

*Q.*: "Ten feet?"

*A.*: "I don't even think it was that far."

*Q.*: "Did you see the gun?"

*A.*: "Yes."

*Q.*: "What did it look like?"

Mass. 55 (1984). Before that decision, "prior inconsistent state-

---

*A.:* "Silver. Like a .380 chrome."

*Q.:* "What happened when he pulled it out?"

*A.:* "He pulled it out, started shooting, and I ducked behind the car at the corner."

*Q.:* "What direction was he shooting in?"

*A.:* "Towards us. Towards me."

*Q.:* "And towards Gregory Tillery?"

. . .

*A.:* "Yes. I got up. And, by the time I was getting up to run, he was behind me."

*Q.:* "Who was behind you?"

*A.:* "Jason."

*Q.:* "And what happened?"

*A.:* "He chased me across the street."

*Q.:* "And what happened next?"

*A.:* "He was trying to shoot, but the gun was jammed because it was —"

. . .

*Q.:* "How much time has passed between the time you saw Jason Clements trying to cock the gun and the time you heard the next round of shots?"

*A.:* "Minute, if. Maybe not even a minute."

. . .

*Q.:* "How far was Kenneth Mattox from where Jason Clements was when Jason Clements open fired?" [*sic*].

*A.:* "Not even as far as just standing to that chair. Not even that far. Real close."

*Q.:* "Less than 20 feet?"

*A.:* "Yes."

. . .

*Q.:* "And the two people that you saw leave the area, who were they?"

*A.:* "It looked like 'Jay' and Kenneth."

*Q.:* "And were they together? Were they running in the same direction?"

ments [including grand jury testimony under oath], though admissible for the limited purpose of impeaching the credibility of a witness's testimony at trial, [were] inadmissible hearsay when offered to establish the truth of the matters asserted." *Id.* at 66. In *Daye*, the Supreme Judicial Court altered the traditional rule but imposed certain limitations. It summarized its decision as follows:

> "[W]e hold that a prior inconsistent statement is admissible as probative if made under oath before a grand jury, provided the witness can be effectively cross-examined as to the accuracy of the statement, the statement was not coerced and was more than a mere confirmation or denial of an allegation by the interrogator, and other evidence tending to prove the issue is presented."

*Id.* at 75.

*Daye* also recognized that, apart from the issue of admissibility, there is a separate question whether the evidence, viewed as a whole, is sufficient for the Commonwealth to meet its burden of proof. In *Daye*, where, as here, the grand jury testimony related to the central issue of identification, the court noted:

> "[W]e will not permit convictions based exclusively on inconsistent extrajudicial testimony to stand. See *California v. Green*, [399 U.S. 149,] 170 & n.19 [1970]. In this case the Commonwealth must produce identification evidence in addition to a prior inconsistent statement in order to meet its burden of proof."[6]

*Id.* at 74.

---

*A.*: "Yes."

*Q.*: "How far apart were they from each other?"

*A.*: "They was right next to each other, running down the street."

---

[6]As will be discussed later in this opinion, we do not view the photographic identification, which was admissible as substantive evidence prior to *Daye*, under Proposed Mass.R.Evid. 801(d)(1)(C), as being within the meaning of "a prior inconsistent statement" as used in the quotation. *Daye*, in using that term, was, in our view, referring to a statement under Proposed Mass.R.Evid. 801(d)(1)(A), such as the grand jury testimony.

More recently, in *Commonwealth* v. *Sineiro*, 432 Mass. 735 (2000), the court, after reiterating the conditions for admission set by *Daye*, explained that when the grand jury testimony concerns a central issue of the case, corroboration relates not only to the question of admissibility but also to that of sufficiency. This is implicit in the following excerpt from *Sineiro* at 741-742:

> "In *Daye*, we held that prior inconsistent testimony by a witness before a grand jury, under certain conditions, could be admitted as substantive evidence. [393 Mass.] at 75. In so holding, we adopted the principles of Proposed Mass. R. Evid. 801 (d)(1)(A). We set forth three general requirements for the use of such grand jury testimony: (1) there must exist an opportunity for effective cross-examination of the witness at trial; (2) the witness's statement must clearly be that of the witness, rather than the interrogator, and be free from coercion; and (3) some corroborative evidence must be presented. See *id.* at 73-75. See also *Commonwealth* v. *Berrio*, 407 Mass. 37, 45 (1990). With reference to corroboration, we held in *Commonwealth* v. *Noble*, 417 Mass. 341 (1994), that, *when the prior inconsistent grand jury testimony concerns an essential element of the crime, the Commonwealth must offer at least some additional evidence on that element in order to support a conclusion of guilt beyond a reasonable doubt. Id.* at 345 (adopting test set forth in *United States* v. *Orrico*, 599 F.2d 113, 119 [6th Cir. 1979]).[7] *The additional evidence, however, need not be sufficient in itself to establish a factual basis for each element of the crime. Id.* at 345 n.3." (Emphasis supplied.)

We consider that the requirements of *Daye* both as to admissibility and sufficiency have here been met. The first two requirements of admissibility need not detain us. Although the

---

[7]Although the distinction between the admissibility of grand jury evidence and its sufficiency is not always clearly delineated in our cases, that the two are separate issues is evident from the adoption by the *Noble* court of the test for sufficiency set forth in *Orrico*. In *Orrico*, 599 F.2d at 116, the court specifically stated: "We decide the issue of sufficiency of the evidence, rather than admissibility, because the former issue is determinative of the question whether Orrico may be retried."

defendant argues that Willis was unavailable for cross-examination as to the accuracy of his grand jury statements because portions were read to the jury after Willis left the stand, the claim is without merit. Not only did the defendant fail to object on this ground until the next trial day, he also did not move to have Willis recalled. More important, prior to the reading, Willis had been thoroughly examined on the subject matter of the grand jury statements that were read to the jury.

The defendant also claims that, since Willis testified at trial that he was influenced by Tillery's family (he admitted he had not been coerced) and had made his pretrial identifications because of rumors and secondhand information, the pretrial identifications were not those of Willis, but of unnamed third persons and should not have been admitted. See *Daye, supra* at 73 n.18. Willis, however, asserted to the grand jury that he saw the defendant shoot at him and Tillery. Only at trial did he claim that the identification was based on secondhand reports. Whether to give credence to the pretrial identifications or to his later disavowal was a determination for the jury. *Commonwealth v. Noble*, 417 Mass. at 347.

In discussing the third *Daye* requirement in terms of admissibility, leaving aside for the moment the question of sufficiency, it may be helpful to note that here, as in *Daye, supra*, two discrete sections of Proposed Mass.R.Evid. 801(d), are involved. Rule 801(d) in relevant part provides:

> "(d) Statements which are not hearsay. A statement is not hearsay if —
>
> "(1) Prior statement by witness. The declarant testifies at the trial or hearing and is subject to cross-examination concerning the statement, and the statement is
>
> > (A) inconsistent with his testimony and was given under oath subject to the penalty of perjury at a trial, hearing, or other proceeding, or in a deposition, or
> >
> > . . .
> >
> > (C) one of identification of a person after perceiving him . . . ."

Section 801(d)(1)(A), as discussed earlier, was first adopted by

*Daye*, while 801(d)(1)(C) is of longer standing and is "a rule consistent with our cases governing probative use of extrajudicial identifications." *Daye, supra* at 61 n.9. Admitted under the latter section, Willis's out-of-court photographic identification was an exhibit at trial and constituted substantive evidence, having probative value, even though Willis was unable or unwilling to make an in-court identification. *Commonwealth* v. *Torres*, 367 Mass. 737, 739 & n.2 (1975). *Commonwealth* v. *Fitzgerald*, 376 Mass. 402, 408-409 (1978). *Commonwealth* v. *Vitello*, 376 Mass. 426, 458-459 (1978). *Commonwealth* v. *Weichell*, 390 Mass. 62, 71-72 (1983), cert. denied, 465 U.S. 1032 (1984). *Commonwealth* v. *Daye*, 393 Mass. at 61.

Willis's photographic identification serves in this case as the additional evidence needed for purposes of permitting the admission of Willis's grand jury testimony and, when considered together with the grand jury testimony, was sufficient to warrant submission of the issue of identification to the jury. The reliability of the photographic identification must, of course, be the criterion for both purposes. See, e.g., *People* v. *Cuevas*, 12 Cal. 4th 252, 268-269 (1995).

The circumstances of the identification suggest reliability. The defendant was known to Willis, who had grown up in the neighborhood with him. The shooter was, according to Willis's trial testimony, only approximately ten feet away when Willis first saw him, and Willis could see the gun sufficiently clearly to believe that it was a .380 automatic. Bullets and a discharged casing from a .380 semiautomatic[8] were found near the victim's body.

The reliability of the photographic identification evidence must also be considered in the context of Willis's unwillingness or inability to identify the defendant at trial. Willis was a most reluctant witness and, it could be concluded, a fearful one.[9] His fears may have been exacerbated by the bad blood between him

---

[8]The terms "semiautomatic" and "automatic" were used interchangeably at trial by the Commonwealth's ballistics expert.

[9]Asked if he was nervous about testifying, he answered: "No. I mean, yeah. Of course I'm nervous." In response to the question whether he was concerned about his safety, he responded, "Yeah. Somewhat —."

and the defendant and the recognition that, at trial, he would have to face the defendant.[10]

Additional support for the reliability of Willis's identification came from Detective John McCarthy of the homicide unit of the Boston police department who had interviewed Willis at the police station on March 9, 1995. McCarthy testified that Willis had picked out the defendant from an array of eight pictures as the man who tried to shoot him and had, at McCarthy's direction, signed his name on the back of the photo. The testimony of Detective McCarthy concerning Willis's extrajudicial identification to which there was no objection was also substantive evidence admissible for its probative value. *Commonwealth* v. *Daye*, 393 Mass. at 60 n.8. But see *Commonwealth* v. *Amado*, 387 Mass. 179, 186 (1982).

The reliability of a pretrial identification has been repeatedly emphasized by the Supreme Judicial Court and is "regarded as having equal or greater testimonial value than one made in court . . . ." *Commonwealth* v. *Torres*, 367 Mass. at 739. *Commonwealth* v. *Weichell*, 390 Mass. at 71. Not only is such an identification closer in time to the criminal incident when the witness's memory is fresher, but it is also made before intervening events may have influenced the witness to testify falsely.[11] See *Daye, supra* at 71. See also the dissent of Justice Liacos in *Commonwealth* v. *Weichell, supra* at 87, where he states: "[T]he

---

[10]In July, 1995, "Scarface," the song about a "guy's best friend dying," which had previously been sung by Mattox to Tillery and Willis, was again sung to Willis by the defendant, causing what he described at trial as an incident at the Dorchester courthouse. Willis's grand jury testimony read at trial was more detailed. There, Willis stated that the defendant followed him out of the courthouse and, when asked why he was following him, said: "He never seen a man cry until he seen a man die." At that point Willis punched the defendant in the face.

[11]In discussing the desirability of adopting Rule 801(d)(1)(C), a provision originally not included in the Federal Rules of Evidence, S. Rep. No. 94-199, 94th Cong., 1st Sess. 2 (1975), stated: "Since these identifications take place reasonably soon after an offense has been committed, the witness' observations are still fresh in his mind. The identification occurs before his recollection has been dimmed by the passage of time. Equally as important, *it also takes place before the defendant or some other party has had the opportunity, through bribe or threat, to influence the witness to change his mind*" (emphasis supplied). See *Commonwealth* v. *Sineiro*, 432 Mass. at 742-743 & n.7, discussing the turncoat witness.

extrajudicial identification is as probative of the defendant's guilt as an in-court identification, in both practical and legal effect."

There is even strong indication in our cases that an extrajudicial identification, such as the photographic one in this case, would alone be enough to withstand a due process violation claim that there was insufficient evidence of identification. See *Jackson* v. *Virginia*, 443 U.S. 307, 316 (1979). Thus, in *Commonwealth* v. *Torres*, 367 Mass. at 738 n.1, the court stated, "Although it is *not essential* to our decision [that is, the voice identification alone would be enough] we note that there was strong circumstantial evidence of the defendant's guilt" (emphasis supplied). In *Commonwealth* v. *Vitello*, 376 Mass. at 461, the court, noting that there was authority to the contrary (*People* v. *Gould*, 54 Cal. 2d 621, 631 [1960], which as indicated in note 13, *infra*, was subsequently overruled), stated: "[W]e think that an extrajudicial identification may in an appropriate case provide a jury with a sufficient basis upon which to find a defendant guilty beyond a reasonable doubt." See also *Commonwealth* v. *Fitzgerald*, 376 Mass. at 410 n.5, which left open the question whether such an identification would in itself be sufficient; *Commonwealth* v. *Weichell*, 390 Mass. at 72 n.8, where the court pointed out: "Although sufficient evidence of reliability exists to permit the introduction of the composite [drawing] in this case, we would not, at this time, sustain a conviction where such a composite constituted the only evidence of identification, absent a more general acceptance of such evidence or a greater demonstration of its reliability." *Fitzgerald* and *Weichell* suggest at least the possibility that an extrajudicial identification based on photographic identifications alone would suffice. *Torres* indicates that voice identification alone would be enough.[12] See *Commonwealth* v. *Mendrala*, 20 Mass. App. Ct. 398, 400-402 (1985) (spontaneous utterance sole evidence of identification).

Numerous cases elsewhere, cited in the margin, permit extra-

---

[12]Although it is true as pointed out by the dissent, that in some of our cases the prior extrajudicial identifications were not disavowed, the whole tenor of the *Daye* and *Sineiro* decisions is to focus on prior inconsistent statements or identifications where the witness recants or feigns lack of memory at trial.

judicial identification evidence, if deemed reliable, to be the sole identification evidence against the defendant when the recanting or nonrecollecting witness testifies at trial and is subject to cross-examination.[13]

As Judge Learned Hand observed in *DiCarlo* v. *United States*,

[13]See, e.g., *People* v. *Cuevas*, 12 Cal. 4th 252, 275-277 (1995) (two witnesses' extrajudicial statements to police identifying defendant, together with photo identification by one witness, held sufficient despite recantation; *Cuevas* overruled *People* v. *Gould*, 54 Cal. 2d 621 [1960] [noted in *Commonwealth* v. *Vitello, supra*], which held out-of-court identification without other evidence insufficient); *State* v. *Newsome*, 238 Conn. 588, 618 (1996) (signed sworn statement given to police held sufficient despite recantation); *Acosta* v. *State*, 417 A.2d 373, 377-378 (Del. 1980) (out-of-court statements of two children to police and stepfather that they had to perform fellatio on the defendant but denied at trial held sufficient; convictions, however, reversed because fair trial required special instruction as to care required before convicting solely on the out-of-court statement inconsistent with victims' in-court testimony); *Weeks* v. *State*, 187 Ga. App. 307, 308 (1988) (conviction for molestation of defendant's stepdaughter upheld on the basis of prior inconsistent statement alone); *Bedford* v. *State*, 293 Md. 172, 174-185 (1982) (extrajudicial photographic identifications by two witnesses sufficient although witnesses later unable to identify defendant); *People* v. *Chavies*, 234 Mich. App. 274, 288-290 (1999), cert. denied, 531 U.S. 841 (2000) (statements to police matched by grand jury testimony of two witnesses sufficient, although both at trial claimed no recollection); *State* v. *Mancine*, 124 N.J. 232, 256 (1991) (in dictum court indicated criminal charge may be proven through prior inconsistent statement alone, provided statement made under circumstances supporting its reliability); *People* v. *Fratello*, 92 N.Y.2d 565, 572-574 (1998), cert. denied, 526 U.S. 1068 (1999) (excited utterance, only evidence of identification, held sufficient despite recantation); *State* v. *Hendrix*, 50 Wash. App. 510, 514-516 (1988) (extrajudicial identification sufficient although witness unable to identify defendant at trial; might be different if witness considered she had been mistaken). See also *Ticey* v. *Peters*, 8 F.3d 498, 503-504 (7th Cir. 1993) (rape victim identified the defendant as her attacker at hospital and again three days later, held sufficient although witness unsure at trial). Contra, see, e.g., *United States* v. *Orrico*, 599 F.2d 113, 117-118 (6th Cir. 1979) (testimony of two witnesses offered pursuant to two separate exceptions to hearsay rule — past recollection recorded and prior inconsistent grand jury testimony — held insufficient where both witnesses professed lack of memory, so that cross-examination, in effect, impossible); *Brower* v. *State*, 728 P.2d 645, 646-648 (Alaska Ct. App. 1986) (uncorroborated grand jury evidence insufficient where recanted at trial); *State* v. *Moore*, 485 So. 2d 1279, 1281 (Fla. 1986) (prior inconsistent statements of two witnesses at grand jury, recanted in sworn depositions alone insufficient); *State* v. *Pierce*, 906 S.W.2d 729, 733-737 (Mo. Ct. App. 1995) (extrajudicial statement alone identifying defendant, recanted at trial, insufficient); *State* v. *Pinkerton*, 270 Mont. 287, 292-293 (1995) (dismissal reversed, court indicating that prior inconsistent statement standing alone insufficient, but corroborated prior inconsistent statement may suffice);

6 F.2d 364, 368 (2d Cir.), cert. denied, 268 U.S. 706 (1925), (and noted by Justice Greaney in *Commonwealth* v. *Sineiro*, 432 Mass. at 744):

> "The possibility that the jury may accept as the truth the earlier statements in preference to those made upon the stand is indeed real, but we find no difficulty in it. If, from all that the jury see of the witness, they conclude that what he says now is not the truth, but what he said before, they are none the less deciding from what they see and hear of that person and in court. There is no mythical necessity that the case must be decided only in accordance with the truth of words uttered under oath in court."

In sum, we hold that (1) the prior photographic identification evidence meets the *Daye* requirement of admissibility — "other evidence tending to prove the issue," see *Daye, supra* at 75; and (2) together with the grand jury testimony which strongly implicated the defendant, the prior identification provided sufficient evidence to sustain the Commonwealth's burden of proof on the issue of identity.

2. *Sufficiency of evidence of joint venture.* The verdict slip, at the instance of the trial judge, asked the jury to determine, if they found the defendant guilty of murder, whether such guilt was as principal or by reason of joint venture. As indicated earlier, they found the defendant guilty of second degree murder as a joint venturer and found Mattox not guilty. Before we reach the defendant's claim that Mattox's acquittal precludes the defendant's conviction as a joint venturer, we must consider the dissent's claim that there was insufficient evidence to convict the defendant as a joint venturer. Although the issue was not specifically raised by the defendant on appeal,[14] a conviction based on insufficient evidence is inherently serious enough to

---

*State* v. *Robar*, 157 Vt. 387, 395-396 (1991) (inquest testimony alone insufficient where witness claimed no recollection at trial).

[14]At trial the defendant filed a motion for a required finding of not guilty on the basis that there was insufficient evidence of joint venture, but he did not repeat this argument on appeal. The evidence relating to Mattox was for the most part contained in Willis's grand jury testimony. Neither at trial nor on appeal did the defendant raise an objection to the admission of the grand jury testimony concerning Mattox.

create a substantial risk of a miscarriage of justice. *Commonwealth* v. *McGovern*, 397 Mass. 863, 867-868 (1986).

Viewing the evidence in the light most favorable to the Commonwealth, we consider the evidence sufficient for a jury to find a joint venture under the standard of *Commonwealth* v. *Latimore*, 378 Mass. 671, 677-678 (1979). See, e.g., *Commonwealth* v. *Noble*, 417 Mass. at 343 n.1. Two guns were involved in the incident; spent bullets and casings from both a nine millimeter and a .380 caliber gun were found at the crime scene. Tillery was shot by the nine millimeter gun. Three bullets entered his chest, two of which had an upward movement. Since the exit wounds from those bullets had abrasions, the medical examiner found they were consistent with his being shot while lying on the ground. The only witness who testified to the location of the body immediately after the shooting said that Tillery was facing Glenway Street (that is his feet were toward Glenway),[15] and that Greenwood Street was behind him.[16] The direction Tillery was facing is important because, if he had been shot from the direction of Greenwood Street, the bullets to his chest would not have had an upward direction. The witness also testified that there were two series of shots, some forty-five seconds apart. This is significant because the short span of time between the two series of shots, which came from two separate guns, warrants the inference that they were fired by two different people.[17] Willis's grand jury testimony, indeed, placed two people at the scene and stated that Mattox and the defendant were together at the time of the shooting and ran away together.

---

[15]Glenway Street intersects Harvard Street and is one street away from and parallel to Greenwood Street. See appendix.

[16]This was consistent with the witness's testimony that she was facing a laundromat on Harvard Street and shook Tillery's right shoulder.

[17]The dissent suggests that it is equally possible that the defendant fired both the nine millimeter gun and the .380. Her theory is that the nine millimeter weapon jammed at the corner of Greenwood and Harvard Streets, and that after the gun became functional, the defendant shot Tillery again with the nine millimeter. This scenario would have the defendant running back along Harvard Street toward Glenway Street, passing Tillery's body, turning around toward Greenwood Street and then shooting him within the "couple of seconds" that elapsed between the time Willis saw his pursuer trying to unjam his gun and the time he heard the shots. Testimony indicated the shots were not fired from close range.

We conclude there was sufficient evidence for the jury to determine beyond a reasonable doubt that the defendant was a participant in a joint venture. See *Noble*, 417 Mass. at 343 n.1.

We also reject the defendant's claim that the verdict of acquittal of Mattox and the verdict of guilty as to the defendant on the theory of joint venture are inconsistent verdicts which require reversal of the defendant's conviction of second degree murder. Each defendant was tried both on the theory of individual liability and joint venture. As stated in *Commonwealth* v. *Robinson*, 48 Mass. App. Ct. 329, 341 (1999):

> " '[M]ere inconsistency of verdicts does not render a guilty verdict erroneous.' [*Commonwealth* v. *Coleman*, 30 Mass. App. Ct. 229, 235 (1991).] Further, where the evidence against one defendant 'appears to be more substantial and persuasive' than the evidence against the other defendants, the joinder of several defendants at trial for the same crime does not require that either all or none of the defendants be found guilty. *Commonwealth* v. *Connearney*, 359 Mass. 200, 202-203 (1971). Here, the evidence against the defendant was considerably stronger and more persuasive than it was with regard to [Mattox]."

See *Commonwealth* v. *Cohen*, 412 Mass. 375, 380-381 (1992); *Commonwealth* v. *Drumgold*, 423 Mass. 230, 254 (1996).

3. *Other claims of the defendant.* (a) Contrary to the defendant's claim that the evidence indicating he sold drugs on the corner of Harvard and Greenwood streets was inadmissible, this testimony, which was not objected to by the defendant, was relevant to show hostility between the defendant (and Mattox) and Tillery (and Willis), all four of whom were selling drugs and may have been fighting over turf. Even if the admission of such evidence were deemed error, it is highly unlikely that such evidence would have affected the jury in determining whether a far more serious crime — murder — had been committed by the defendant, particularly where, as here, the principal witness for the Commonwealth was also selling drugs. Since the defendant failed to object to the evidence, our standard of review is whether there was a substantial risk of a miscarriage of justice. There was no such risk.

(b) The defendant's argument that G. L. c. 234, § 34,[18] was violated is incorrect as there was not a second jury deadlock. In view of the complexity of the case, the multiple charges against the two defendants, and the sixteen witnesses and over fifty exhibits, the judge could well have determined that six hours of deliberations were not "due and thorough." See *Commonwealth v. Valliere,* 366 Mass. 479, 496 (1974).

(c) Contrary to the defendant's contention, the trial judge did not invade the autonomy of the jurors' deliberations. After the judge received a note from the jury indicating that one of the jurors allegedly had made a biased statement, the judge properly conducted an individual voir dire with each juror. See *Commonwealth v. Laguer,* 410 Mass. 89, 97 (1991). After finding no bias, she ordered the jury to continue with their deliberations.

During the course of the voir dire, the judge learned that eleven jurors favored conviction while one juror favored acquittal. The defendant argues that the judge's directive to the jury to continue deliberations may have been interpreted by the jury as an implicit endorsement of the majority position over the one juror who favored acquittal. See *Commonwealth v. Gonzalez,* 28 Mass. App. Ct. 10, 14-15 (1989).

The record shows no impropriety by the judge. The transcript indicates that she was not coercive, did not attempt to influence their judgment, and in no way intimated to the jurors that she agreed or disagreed with their positions. She merely informed the jurors that she had found no evidence of juror bias and that they should continue to deliberate.

(d) The absence of the defendant during the judge's questioning of the jury on the claim of bias — his counsel was present — does not in this case constitute reversible error. Although the defendant had a constitutional right to be present, no objection was raised by defendant's counsel. The review is, therefore, under the substantial risk of a miscarriage of justice standard.

---

[18]General Laws c. 234, § 34, provides: "If a jury, after due and thorough deliberation, return to court without having agreed on a verdict, the court may state anew the evidence or any part thereof, explain to them anew the law applicable to the case and send them out for further deliberation; but if they return a second time without having agreed on a verdict, they shall not be sent out again without their own consent, unless they ask from the court some further explanation of the law."

*Commonwealth* v. *Caldwell*, 45 Mass. App. Ct. 42, 48 (1998). Even if the Commonwealth is required to meet the highest standard, that is, to show that the error was harmless beyond a reasonable doubt, the record shows the Commonwealth met that burden. The transcript indicates that the defendant was represented zealously by counsel, and nothing suggests that there would have been any difference in counsel's actions or the judge's rulings had the defendant been present. See *Commonwealth* v. *Bacigalupo*, 49 Mass. App. Ct. 629, 635 & n.5 (2000).

> *Judgments affirmed.*
>
> *Order denying motion for new trial affirmed.*

Commonwealth *v.* Clements

APPENDIX.

DUFFLY, J. (dissenting). I respectfully dissent from the court's affirmative answer to two of the questions raised by this appeal: (1) whether inconsistent, extrajudicial statements of identification constituting the sole evidence of guilt is evidence sufficient to convict; and (2) whether the jury's special verdict, finding the defendant guilty as a joint venturer but not as the principal of the crime of second degree murder, was supported by evidence sufficient to convict.

1. *Identification evidence.* There is a long-standing distinction in our jurisprudence between identification evidence and all other evidence.[1] In *Commonwealth* v. *Daye,* 393 Mass. 55 (1984), the court set forth criteria pursuant to which a statement of identification made to the grand jury could be admitted as substantive evidence, and established the requirement that "identification evidence in addition to a prior inconsistent statement" must be produced or the evidence will not be sufficient to convict. *Id.* at 74. The court in *Daye* specifically left "open what other evidence would be required where the issue to which the prior inconsistent statements relates is not identification." *Id.* at 75. That issue was first addressed in *Commonwealth* v. *Noble,* 417 Mass. 341, 345-347 (1994). The court in *Commonwealth* v. *Sineiro,* 432 Mass. 735, 741-742 (2000), addressed whether statements made at a probable cause hearing concerning "an essential element of the crime," not identification, are admissible as substantive evidence in the absence of "some corroborative evidence." I do not agree with the majority that this standard, arguably less stringent than that set forth in *Daye,* applies to identification testimony.

The basis for the requirement of additional evidence, when the extrajudicial statement was one made to the grand jury, is that "[g]rand jury testimony, while given under oath, is given in secret, may contain hearsay, is often done by way of leading

---

[1]In part, this is because "eyewitness identification often plays a major, if not determinative, role in the trial of criminal offenses, and the dangers of mistaken identification are great and the result possibly tragic . . . ." *Commonwealth* v. *Dickerson,* 372 Mass. 783, 789 (1977). *Commonwealth* v. *Dougan,* 377 Mass. 303, 316-317 (1979). See *Commonwealth* v. *Fitzpatrick,* 18 Mass. App. Ct. 106, 110 (1984) (discussing "importance of eyewitness identification," and "the Commonwealth's heavy burden with respect to proof of that issue").

questions, and is not subject to cross-examination." *Commonwealth* v. *Sineiro*, 432 Mass. at 743-744. See *United States* v. *Orrico*, 599 F.2d 113, 117 (6th Cir. 1979), on which both *Noble* and *Sineiro* rely ("Our concern in this case focusses on the fact that the central element of the crime with which the defendant was charged was established entirely through the use of out-of-court statements, made at a time when the defendant had no opportunity to cross-examine the witnesses as to the accuracy of their accusations"[2] ). Addressing this concern, the court in *Daye* imposed the requirement of additional evidence, stating: "[W]e will not permit convictions based exclusively on *inconsistent extrajudicial testimony* to stand" (emphasis added). 393 Mass. at 74. Consistent with this proscription, Willis's recanted photographic identification of the defendant cannot constitute that additional evidence necessary to render the inconsistent grand jury statement of identification sufficient to convict.[3,4]

I reiterate certain facts in order to inform my discussion of the requirement of additional evidence set forth in *Daye*. The

---

[2]The out-of-court statements at issue in *Orrico* consisted of one witness's prior, recorded recollection, and another witness's grand jury statement. The statements, which provided evidence of facts constituting an essential element of the crime, did not corroborate each other and were held not sufficient to convict.

[3]Compare *Ticey* v. *Peters*, 8 F.3d 498, 504-505 (7th Cir. 1993) (Cudahy, J., dissenting), "[T]he majority has not pointed to any corroboration of [the witness's] earlier identification. The majority relies for 'corroboration' on another statement by [the witness]. This statement may in a minor way add something to the credibility of the first one, but it essentially piles one uncorroborated (unsworn and unrecorded) statement on another. This is not 'corroboration' as the word is commonly understood. . . . If anything, the guidelines [for admissibility of a prior inconsistent statement] should be applied *more* stringently in a case like [this] where the inconsistent statements are the sole foundation for the conviction. Given the absence of truly corroborative evidence supporting [the witness's] initial identification, the circumstances in this case do not foreclose reasonable doubt."

Even applying the *Sineiro* requirement of "some corroborative evidence" to identification, the outcome would not be different. *Sineiro* does not suggest that the corroborating evidence may be a second recanted inconsistent statement on the same issue.

[4]I agree with the majority that Willis's grand jury identification of Clements as the shooter meets the requirements of admissibility under *Daye*, that the statement was under oath and the witness could be effectively cross-examined.

defense was mistaken identity. The prosecution presented no witness other than Willis who could identify the defendant as the shooter, and there was no circumstantial evidence linking the defendant to the crime — no guns were recovered, no identifiable fingerprints lifted from the bullets or casings found at the scene, and no behavior evoking consciousness of guilt. At trial, Willis did not identify the defendant as the shooter. Asked whether he recognized the person who approached him and Tillery, Willis said "No." He testified that on the evening of January 30, 1995, he was not able to see the face of the shooter, and could not therefore identify him; the person was wearing either two "hoodies," or one hoodie and something covering his face, when he walked down the middle of Harvard Street and started shooting a gun (it "looked like a .380 or something"). He also said that it was dark and he was drunk.[5] Thus, the sole evidence implicating the defendant was Willis's recanted extrajudicial identification. Willis acknowledged at trial that he had identified the defendant as the shooter to the police some six weeks after the shooting, and again during his grand jury statement nearly two years after the event,[6] but stated that he had done so at that time on the basis of rumors in the

---

[5]The fact that, at trial, Willis also testified affirmatively to the standard prosecutorial query, "was your memory better" at that time? is not illuminating, nor particularly relevant. Willis, who knew the defendant, was not testifying either to a lack of memory regarding what the defendant looked liked, or to a lack of memory regarding his identification of the defendant at the police station or to the grand jury. More significant is the fact that the initial identification was made some six weeks after the shooting, and should not therefore be cloaked with the "superior probative worth of an identification made closer in time to the events in question." *Commonwealth* v. *Daye*, 393 Mass. at 61. See note 6, *infra*.

[6]The majority places considerable reliance on the proposition, frequently advanced in our case law, that extrajudicial identification has "equal or greater testimonial value than one made in court." *Commonwealth* v. *Torres*, 367 Mass. 737, 739 (1975). *Commonwealth* v. *Weichell*, 390 Mass. 62, 71 (1983), cert. denied, 465 U.S. 1032 (1984). The value attributed to the evidence is relative, not absolute. See *People* v. *Gould*, 54 Cal. 2d 621, 626-627 (1960), overruled by *People* v. *Cuevas*, 12 Cal. 4th 252 (1995) ("[t]he failure of the witness to repeat the extrajudicial identification in court does not destroy its probative value, for such failure may be explained by loss of memory or other circumstances"). The statement recognizes that an in-court identification made years after the event has no inherent or greater reliability than when the identification was first made "because the circumstances of the earlier identification often were less suggestive and because that identification oc-

neighborhood and pressure from friends and the victim's family to do so.[7] Compare *Commonwealth* v. *Amado*, 387 Mass. 179, 186 (1982) (witness testified at trial that defendant was not the killer, and that witness's pretrial photo identification was made because face "looked familiar"; latter statement viewed by court as "in effect . . . den[ying] making *any* pretrial identification") (emphasis original).

As noted by the majority, extrajudicial identifications and prior inconsistent statements have been treated as distinct by our courts, a distinction tracked by the Federal Rules of Evidence, as well as the Proposed Massachusetts Rules of Evidence (similarly identified as rules 801[d][1][A] and [C]). That both types of inconsistent extrajudicial statements of identification are admissible does not lead to the conclusion that when such statements comprise the sole evidence of guilt, they

---

curred closer to the time of the offense." *Weichell, supra* at 71. See *id.* at 87 (Liacos, C.J., dissenting) (the admissibility of extrajudicial identifications "is premised on a practical assessment of the *relative reliability* of different methods of identification. The inherent suggestiveness of the courtroom setting and the passage of time serve to diminish the reliability of an in-court identification"). (Emphasis added.) Thus, in *Torres*, where there was no attempt at in-court identification, a witness's prior identification made at a probable cause hearing seventeen days after the crime was properly admitted; in *Weichell*, where the witness also identified the defendant at trial, a composite drawing based on the witness's description made hours after observing him was admissible as substantive evidence.

The timing of Willis's earlier identification fails to support the assumption that it was less subject to coercion or suggestibility when made. After the date of the shooting, nearly six weeks passed before Willis made his initial identification at the police station. During that time, according to Willis, he was influenced by rumors and pressured by Tillery's family to identify Clements as the shooter. To the extent that temporal proximity can be said to protect such identifications from "corruption, false suggestion, intimidation, or appeals to sympathy," *State* v. *Newsome*, 238 Conn. 588, 600 (1996), or "the suggestions of others," *Clemons* v. *United States*, 408 F.2d 1230, 1243 (D.C. Cir. 1968), it was not present here.

[7]I do not agree that it is reasonable to infer from the evidence that Willis changed his testimony because he was afraid. I would add to the majority's recitation of facts, on the subject of Willis's "fear," that he admitted to being nervous about testifying ("of course"), but when pressed to admit to "fear," he answered: "Well, it's not really fear. It's just — in neighborhoods, rumors spread. Rumors is what a lot of things happen over. Sometimes, rumors aren't true. So the rumor was that he did it."

are sufficient to sustain a conviction.[8] *Daye* specifically addressed the concerns expressed by members of Congress debating the proposed changes to the Federal rules of evidence, that "a person might be convicted solely upon such evidence," see note 8, *supra*, by requiring that evidence in addition to the inconsistent extrajudicial statements be presented in order to convict. 393 Mass. at 74. I do not agree that the Massachusetts decisions relied on by the majority[9] support a contrary view.[10]

---

[8]The Congressional committee reports accompanying both the adoption of Fed.R.Evid. 801(d)(1)(A) and, subsequently, 801(d)(1)(C), addressing concern about the issue, underscore that the rules address only admissibility and not sufficiency. See discussion in *United States* v. *Orrico*, 599 F.2d 113, 117-118 (6th Cir. 1979).

With respect to the adoption of Rule 801(d)(1)(A), the *Orrico* court noted that the "old rules [were changed], in preference for a very broad standard of admissibility with the goal of placing all relevant evidence before the trier of fact. . . . The possibility of a case arising in which the Government attempted to make its case entirely based on such evidence, previously inadmissible, was foreseen. While the new Rules were under consideration by Congress, *objection was made that admitting prior inconsistent statements as substantive evidence raised the possibility that a person might be convicted solely upon such evidence.* The Senate Committee responded: 'It would appear that some of the opposition to this Rule is based on a concern that a person could be convicted solely upon evidence admissible under this Rule. *The Rule, however, is not addressed to the question of the sufficiency of evidence to send a case to the jury, but merely as to its admissibility. Factual circumstances could well arise where, if this were the sole evidence, dismissal would be appropriate.*' " (Emphasis supplied.) *United States* v. *Orrico, supra.* See 5 Weinstein & Berger, Evidence § 801.21[5] (2d ed. 2000).

In discussing the desirability of adopting Rule 801(d)(1)(C), a provision originally not included in the Federal Rules of Evidence, S. Rep. No. 94-199, 94th Cong., 1st Sess. 2 (1975), also notes the concern, which lead to its earlier exclusion from the Rules, that a conviction could be based on such statements of identification, and goes on to comment: "Upon further reflection, that concern appears misdirected. . . . *[T]his exception is addressed to the 'admissibility' of evidence and not to the 'sufficiency' of evidence to prove guilt"* (emphasis supplied).

[9]I do not include *Sineiro* in my discussion of these cases because, as indicated *supra*, in my view *Sineiro* does not address corroboration of grand jury identification testimony. That was decided by the court in *Daye.*

[10]The majority cites a number of other jurisdictions that have held that recanted extrajudicial statements are not sufficient to convict absent corroboration. See also, e.g., *Gibbs* v. *State*, 7 Md. App. 35, 39-40 (1969) (where witness recanted his several earlier identifications, "any evidential value which the extrajudicial identifications may have had was . . . completely dissipated," and insufficient "upon which to base a finding of guilt

In *Commonwealth* v. *Fitzgerald*, 376 Mass. 402 (1978), the court developed previously enunciated principles regarding the admissibility of extrajudicial identifications. The essential facts in *Fitzgerald* involve, as they do here, a witness who had selected the defendant's photograph from an array at the police station, and again identified the defendant as the perpetrator in subsequent statements to the grand jury. At trial, the witness did not cooperate with the prosecution, and her identification testimony there was "contradictory and inconsistent." *Id.* at 406. The court held that, "even when a witness is unable or unwilling to make an in-court identification, out-of-court identifications may be admitted as substantive evidence of guilt as long as the defendant's due process and confrontation rights are satisfied." *Id.* at 408. Prognosticating the *Daye* requirement of additional evidence to support sufficiency, the court went on to state, "As such substantive evidence, extrajudicial identifications may be considered *in conjunction with other substantive evidence* in evaluating the disposition to be made on a motion for a directed verdict" (emphasis added). *Ibid.* Thus, under *Fitzgerald*, two extrajudicial identifications were still required to be considered "in conjunction with other substantive evidence" of guilt to overcome a motion for required finding.[11]

In contrast to the case at bar, where Willis, an "unwilling" witness, acknowledged having made an earlier identification, but at trial testified that the prior identification was not accurate, *Commonwealth* v. *Torres*, 367 Mass. 737, 738-739 (1975) (see note 6 *supra*), and *Commonwealth* v. *Vitello*, 376 Mass. 426,

---

beyond a reasonable doubt"). Because I would distinguish circumstances in which a witness does not recant the extrajudicial identification, I would not have included as supporting the majority's view the following: *Bedford* v. *State*, 293 Md. 172, 174-185 (1982); *State* v. *Hendrix*, 50 Wash. App. 510, 514-515 (1988) (citing cases from other jurisdictions in which extrajudicial identifications have been held sufficient to support a conviction, but noting "in those cases . . . , the witnesses . . . did not express reservations regarding their prior identification when describing it at trial").

[11]The *Fitzgerald* court declined to reach the issue raised by the defendants in that case, that use of "the photographic identifications as the sole basis for a jury verdict of guilty would violate [the defendants'] rights of due process and confrontation," noting the presence of "other substantive evidence of guilt," including the witnesses's in-court identification of the defendants. *Commonwealth* v. *Fitzgerald*, 376 Mass. at 410 & n.5.

458-459 (1978),[12] accord *Commonwealth* v. *Weichell*, 390 Mass. 62, 71-72 (1983), cert. denied, 465 U.S. 1032 (1984), cited by the majority, illustrate circumstances where a witness who is "unable" to make an in-court identification, nevertheless at trial adopts the extrajudicial identification as still accurate.

As noted earlier, Willis *acknowledged* that he had made the prior identifications.[13] A witness's "acknowledgment" that a pretrial photographic identification was made means something different than a witness's "affirmation" or "adoption" of his prior identification. If a witness at trial rejects the truth or validity of a prior statement, although agreeing that the statement was made, the testimony does not "constitute a plain adoption of an earlier statement." See *Commonwealth* v. *Fiore*, 364 Mass. 819, 823-824 (1974). Acknowledgment of a pretrial photographic identification means merely that the witness recalls, at trial (as Willis did here), that he or she selected the photograph of the defendant who the witness, at the time of selection, identified to be the perpetrator of the crime. Compare *Commonwealth* v. *Amado*, 387 Mass. at 186-189.

When an extrajudicial identification or statement is affirmed by the witness now testifying in court as having been accurate when made, and is adopted by the witness at trial, the statement is no longer hearsay but testimonial. See *Commonwealth* v. *Fiore*, 364 Mass. at 823-824; *Commonwealth* v. *Tiexeira*, 29 Mass. App. Ct. 200, 202 (1990); *Commonwealth* v. *Fort*, 33 Mass. App. Ct. 181, 187 n.2 (1992); 5 Weinstein & Berger,

---

[12]In *Vitello*, the court held that "[t]he extrajudicial identification may be used substantively even when the witness is unable or unwilling to make an in-court identification. . . . Assigning independent probative value to extrajudicial identification in such a situation is reasonable, we have noted, 'particularly where the witness, because of the time lapse before trial, is unable to make an in-court identification but clearly recollects having positively identified the defendant earlier.' " 376 Mass. at 458-459, quoting from *Commonwealth* v. *Swenson*, 368 Mass. 268, 272 n.3 (1975). In *Vitello*, a witness testified at trial that he was "positive" of the accuracy of the extrajudicial identification. He was unable to make an in-court identification of the defendant, who had lost considerable weight.

[13]Absent such acknowledgment, the identification is not admissible as probative evidence because the witness is not subject to cross-examination. See *Commonwealth* v. *Daye, supra* at 73-74 & n.17, and our discussion, *infra*. See also *Commonwealth* v. *Kater*, 409 Mass. 433, 447 (1991).

Evidence § 801.21[4] (2d ed. 2000). See also *Commonwealth* v. *Daye*, 393 Mass. at 67 n.13.

The *Daye* test strikes an appropriate balance between developing rules of evidence and important constitutional protections, and does not support the conclusion that a witness's recanted out-of-court statements of identification combine to constitute evidence sufficient to convict in the absence of additional evidence of identification.

2. *Joint venture.* Even if the majority is correct that the evidence identifying the defendant as the shooter was sufficient to convict on that basis, I would reverse. The issue is whether the evidence of joint venture was sufficient to allow the case to go to the jury on that theory. "Here it is clear that the jury based their . . . verdict on the joint venture theory only." *Commonwealth* v. *Alvarez*, 422 Mass. 198, 212 (1996). The jury, on special jury slips, found the defendant guilty of second degree murder of Tillery as a joint venturer, but not as a principal. "The judge's action on a motion for a required finding based on a specific theory[14] must be measured by the state of the evidence when the Commonwealth rests, and if such evidence is lacking, the defendant is entitled to a required finding as to that theory." *Commonwealth* v. *Berry*, 431 Mass. 326, 331 (2000). " '[The] question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.' . . . Thus, to sustain the denial of a directed verdict, it is not enough for the appellate court to find that there was some record evidence, however slight, to support each essential element of the offense; it must find that there was enough evidence that could have satisfied a rational trier of fact of each such element beyond a reasonable doubt." *Commonwealth* v. *Latimore*, 378 Mass. 671, 677-678 (1979) (citation omitted). *Commonwealth* v. *Flynn*, 420 Mass. 810, 814 (1995).

---

[14]At the close of the Commonwealth's evidence the defendant made a motion for a required finding of not guilty on the grounds that there was a failure of proof both as to identification (see discussion in part 1, *supra*), and as to his participation as a joint venturer.

Here, as in *Commonwealth* v. *Berry, supra,*[15] and *Commonwealth* v. *Green,* 420 Mass. 771, 779 (1995),[16] "[t]he Commonwealth needed to present evidence that a principal other than the defendant committed the [shooting]." *Berry, supra* at 332. See *Commonwealth* v. *James,* 30 Mass. App. Ct. 490, 500 (1991) ("there must be a guilty principal before there can be an aider or abettor . . ."). In addition, the Commonwealth needed to establish that the defendant was present at the scene,[17] and that he shared with the principal the intent to commit murder. *Commonwealth* v. *Filos,* 420 Mass. 348, 354 (1995) (to prove defendant was guilty of aiding or abetting "the Commonwealth had to introduce sufficient evidence that someone committed the prohibited act, and that the defendant intentionally assisted the principal in the commission of the crime while sharing the mental state required for that crime"). *Commonwealth* v. *Berry,* 431 Mass. at 330 ("the Commonwealth must prove that the defendant shared the mental state required for the crime of manslaughter, and that he satisfied the other elements of the test for joint venturer"). See *Commonwealth* v. *Soares,* 377 Mass. 461, 470, cert. denied, 444 U.S. 881 (1979); *Commonwealth* v.

---

[15]In *Berry,* 431 Mass. at 327-328, a group of people, including the defendant, approached the place where the victim was standing. One of the members of the approaching group was "looking" at the victim; the defendant and the victim exchanged words; then the defendant and the victim began to fight. Police officers saw three or four separate groups fighting. The victim was stabbed and died as a result. A knife was found at the scene. During the altercation, the defendant was seen with a "shiny object." This was enough to convict the defendant as a principal, but not as a joint venturer.

[16]In *Green,* 420 Mass. at 772-773, the victim and witness had engaged in a drug transaction with the defendant pursuant to which the victim withheld some money and the defendant issued threats. Several nights later, a car drove by the victim and witness and a shot was fired from the passenger side. After four more shots were fired, the witness looked up and saw the defendant pointing a gun at them. This was not evidence sufficient to establish "that there was a principal other than the defendant who committed the shooting . . .[, or] that the defendant was, by agreement, willing and able to assist this principal in the shooting, and knew that the principal had a gun." *Id.* at 779.

[17]A related theory of joint venture culpability, not requiring presence, but not applicable on the facts of this case, is accessorial liability. See G. L. c. 274, § 2. "[I]n order to be punished as an accessory before the fact, the defendant must have actually aided in the commission of the felony or counseled, hired, or otherwise procured someone to commit it." *Commonwealth* v. *Raposo,* 413 Mass. 182, 188 (1992). See *Commonwealth* v. *Ortiz,* 424 Mass. 853, 857 (1997).

*Mendes*, 46 Mass. App. Ct. 581, 587 (1999). The requisite elements have been summarized as follows: "the Commonwealth must prove (1) that the defendant was present, (2) with knowledge that another intended to commit the crime or with intent to commit the crime,[18] and (3) by agreement was willing and available to help if necessary." *Commonwealth* v. *Lee*, 43 Mass. App. Ct. 164, 167 (1997). In the circumstances of this case, the Commonwealth must have presented evidence sufficient to establish, beyond a reasonable doubt, that Mattox was the principal in the shooting of Tillery and that the defendant shared with Mattox the intent to shoot Tillery.

Even if Willis's inconsistent statements in the grand jury minutes as to Mattox's presence at the scene were corroborated as required, see *Sineiro*, 432 Mass. at 741-742,[19] and thus were admissible substantively, the evidence does not allow any

---

[18]In several cases, including most recently *Commonwealth* v. *Berry*, *supra* at 330, a portion of this summary has been stated as requiring that the defendant have "knowledge that another intended to commit the crime or with intent to commit *a* crime" (emphasis added). See, e.g., *Commonwealth* v. *Longo*, 402 Mass. 482, 486 (1988); *Commonwealth* v. *Mahoney*, 406 Mass. 843, 846 (1990); *Commonwealth* v. *Ortiz*, 424 Mass. at 856; *Commonwealth* v. *Sim*, 39 Mass. App. Ct. 212, 215 (1995). See also *Commonwealth* v. *Silanskas*, 433 Mass. 678, 689 (2001). The apparently inadvertent use of the indefinite article in this location in the sentence could, out of context, be viewed as suggesting that the intent to commit "any" crime, but not necessarily "the" crime that the principal intended to commit, will confer joint venture liability. The iteration "knowledge that another intends to commit a crime," see *Commonwealth* v. *Clarke*, 418 Mass. 207, 214 (1994), "or with intent to commit the crime," would be correct, as is "knowledge that another intends to commit the crime or with intent to commit the crime." See *Commonwealth* v. *Lee*, 43 Mass. App. Ct. 164, 167 (1997).

[19]Willis, testifying at trial, denied that the co-defendant, Mattox, was present at the time of the shooting and stated that no one was near the shooter when he walked down the middle of the street and began to shoot. Willis saw no one he recognized running from the scene of the shooting. At the police station, Willis did not identify anyone other than the defendant as present at the shooting, nor did he identify the defendant or Mattox as either of the two people he saw running; he stated that he could not see who the two people running were, or what they were wearing, or whether they were carrying anything. He did not select a photograph of Mattox until the grand jury proceedings. Thus, the only evidence that Mattox was present at the scene was contained in the inconsistent grand jury statements. To be admissible substantively, these statements would have to be corroborated by additional in-court evidence identifying Mattox. It might be argued that, as testimony concerning an element of the crime, only "some additional evidence on that

rational trier of fact to find the essential elements of the crime beyond a reasonable doubt.

To the grand jury, Willis stated that during the shooting Mattox was "[d]irectly across the street on the next corner." "When 'Jay' came down the street, shooting, [Mattox] was there, across the street." He described the distance as "[l]ess than 20 feet." "Not even as far as just standing to that chair. Not even that far. Real close." He also stated to the grand jury that after the second round of shots, he saw two people running who "looked like" the defendant and Mattox. Portions of the grand jury statements relating to the shooting and admitted in evidence are set forth in the margin.[20]

---

element" would be needed. See *Sineiro, supra* at 742. In my view, that modicum of evidence is also absent. This was not, however, an issue raised on appeal. In any event, the admission of the grand jury statements does not change the outcome in light of my view that the statements as they relate to Mattox's role as principal do not provide evidence sufficient to convict the defendant as a joint venturer.

[20]*Q.*: "What happened after Gregory Tillery was done speaking with the person he knew?"

*A.*: "Someone came walking in the middle of the street."

*Q.*: "When you say 'someone came walking in the middle of the street,' who came walking in the middle of the street?"

*A.*: "Jay."

*Q.*: "Jason Clements?"

*A.*: "Yes."

*Q.*: "Did you see which direction Jason Clements came from?"

*A.*: "It looked like he was coming from the bridge towards the opposite direction, the way we just came."

*Q.*: "Was he headed towards you?"

*A.*: "Yes."

. . .

*Q.*: "What happened as you saw Jason Clements walking towards you?"

*A.*: "He took a quick turn, pulled out a gun, and started shooting."

*Q.*: "How far was he from you and Gregory Tillery when he started shooting?"

That there were two guns fired may be inferred from the ballistics evidence. Live and spent bullets and casings from a .380

---

*A.:* "Like maybe from here to that table."

*Q.:* "Ten feet?"

*A.:* "I don't even think it was that far."

*Q.:* "Did you see the gun?"

*A.:* "Yes."

*Q.:* "What did it look like?"

*A.:* "Silver. Like a .380 chrome."

*Q.:* "What happened when he pulled it out?"

*A.:* "He pulled it out, started shooting, and I ducked behind the car at the corner."

*Q.:* "What direction was he shooting in?"

*A.:* "Towards us. Towards me."

. . .

*A.:* ". . . I got up. And, by the time I was getting up to run, he was behind me."

*Q.:* "Who was behind you?"

*A.:* "Jason."

*Q.:* "And what happened?"

*A.:* "He chased me across the street."

*Q.:* "And what happened next?"

*A.:* "He was trying to shoot, but the gun was jammed because it was —"

. . .

*Q.:* "How much time has passed between the time you saw Jason Clements trying to cock the gun and the time you heard the next round of shots?"

*A.:* "Minute, if. Maybe not even a minute."

*Q.:* "Where was Kenneth Mattox during this period of time?"

*A.:* "Directly across the street on the next corner."

*Q.:* "When was the last time you remember seeing Kenneth Mattox and what you have described as having gone on?"

semiautomatic and a nine millimeter semiautomatic gun were found at the scene, in the area between where the bicycle lay in the middle of Harvard Street and the closed Harvard Street bridge, at the intersection of Harvard, Greenwood and Standish streets.[21] Willis testified that the gun in the defendant's hand when he first approached and started shooting looked "[l]ike a .380 chrome." Based on the medical testimony, at least three of

---

*A.*: "When 'Jay' came down the street, shooting, he was there, across the street."

*Q.*: "How far was Kenneth Mattox from where Jason Clements was when Jason Clements open fired?" [*sic*].

*A.*: "Not even as far as just standing to that chair. Not even that far. Real close."

*Q.*: "Less than 20 feet?"

*A.*: "Yes."

*Q.*: "And did you see what Kenneth Mattox did when Jason Clements was chasing after you?"

*A.*: "No."

*Q.*: "Do you know whether or not he stayed in the area?"

*A.*: "I don't know. From when I had got away and ran down the street and I was at the bridge, at the end of the street, and it's high in the air, I was checking to see if I got shot because I was so close. I thought I got shot and I didn't feel it."

*Q.*: "What did you see?"

*A.*: "And I saw two guys running down that same street, that same street I ran; and they took the first turn, that first right onto the next street that goes off of that street. Two guys, one tall, one short."

. . .

*Q.*: "And the two people that you saw leave the area, who were they?"

*A.*: "It looked like 'Jay' and Kenneth."

[21]In the area close to the bicycle, on the side toward the bridge — where Harvard Street intersects with Greenwood and Standish — and away from the liquor store, were found two .380 caliber live rounds and one .380 caliber discharged casing, four nine millimeter discharged casings, four spent nine millimeter bullets, and a bullet fragment. One nine millimeter spent shell casing was found ten feet north of the bicycle, toward Standish Street. Three of the nine millimeter spent bullets were located beneath Tillery. Some distance away, at the corner of Harvard and Standish streets, a single nine millimeter

the bullet wounds to Tillery's body came from the same nine millimeter gun. A nine millimeter live round, such as one that (according to the ballistics expert) would be ejected following an attempt to clear a jam, was found near the corner of Harvard and Standish. Also in the direction of that corner, ten feet north of the bicycle where Tillery fell to the ground after being shot, a nine millimeter casing was found. Willis testified that he heard a second series of gunshots soon after he observed the shooter attempt to unjam his gun at the corner. A witness, who heard the gunshots from where she stood in the laundromat, testified that the two series were forty-five seconds apart.

It is not enough to produce evidence sufficient to establish Mattox as a joint venturer. In the circumstances of this case, the gun that shot and killed Tillery must be placed (inferentially if not directly, but in either case beyond a reasonable doubt) in Mattox's hand. See *Commonwealth* v. *Green*, 420 Mass. at 779; *Commonwealth* v. *Berry*, 431 Mass. at 332. Then, in order to establish the requisite shared intent, the Commonwealth needed to establish "beyond a reasonable doubt that [the defendant] knew that [Mattox] was armed with a [gun]." *Commonwealth* v. *Hennessey*, 17 Mass. App. Ct. 160, 163 (1983). This is not a situation, like a group melee, "in which the participants act together with a similar mental set toward a common end and where it may be unfeasible, and in any event needless, to decide who was a principal and who a helper — for each is guilty whether acting in one or the other role or successively in both." *Commonwealth* v. *Sanchez*, 40 Mass. App. Ct. 411, 418-419 (1996). Nor is this a joint venture in which felony-murder was also charged, thus implicating broader concepts of criminal complicity not operative here. See *Commonwealth* v. *Richards*, 363 Mass. 299, 307 (1973) ("A broad conception of complicity

---

live round was also retrieved. Ballistics experts testified at trial that when a semiautomatic is fired, the case ejects either to the left or right of the gun. When the gun jams, efforts to cock or unjam the gun may result in a live round ejecting from the gun. Once the bullet is ejected, the gun can be fired.

The evidence indicates that Tillery was shot first from a distance by a bullet entering the side of his neck hitting his spine and resulting in immediate paralysis. Tillery was also shot from the front, not at close range, most probably after falling to the ground, once in the middle of the forehead and three times in the chest. The gun shot wounds to the chest indicate they were fired in rapid succession.

is indeed at work in the special field of so called felony-murder, but there is no basis for importing it into the present case," where the charge is joint venture).

Here the evidence permits the reasonable inference that the defendant was the sole gunman, thus: Walking down Harvard Street from the bridge, the defendant shot at and hit Tillery in the neck with a .380, resulting in Tillery's immediate paralysis so that he could not flee but fell where he had been standing, near the bicycle. At some point, the .380 jammed, as evidenced by two live .380 rounds found in the vicinity of the body. The defendant, it may be inferred, stopped to check whether Tillery was dead; finding him alive but disabled, he turned his attention to Willis, who had in the meantime ducked behind a van. By the time Willis got up to run, the defendant was behind him, and chased him back up the street to the corner of Harvard and Standish. There, the defendant attempted to fire a second gun, a nine millimeter, but this, too, jammed. This is evidenced by the live nine millimeter round found at that same location. The defendant then ran a few feet back down Harvard, shooting Tillery as he lay on the ground in front of the laundromat, four storefronts from the corner. This is evidenced by the nine millimeter casing found ten feet north of the bicycle, the four nine millimeter casings found closer to the bicycle, and the three spent nine millimeter bullets retrieved from underneath Tillery.

A majority of the panel think the evidence supports the necessary inferences that Mattox fired the gun that shot and killed Tillery and that the defendant shared with Mattox the intent to kill Tillery. To reach the requisite inferences requires the following train of inferential thought: that two weapons were fired at Tillery; that Mattox had in his possession one of the guns; that Mattox's gun killed Tillery; and that the defendant was aware that Mattox had a gun and that he intended to use it to kill Tillery.[22] These are inferences too tenuous to constitute more than impermissible speculation. "The question of guilt

[22]The majority's inference is based in part on testimony of a lay witness that placed Tillery's body in the street "facing Glenway," with his feet toward the bicycle. If positioned in this fashion, the defendant would have had to run from the corner of Harvard and Standish and past the body before shooting, as two of the bullet wounds had an upwards trajectory (a third, however, traveled in a downward direction). The only evidence regarding the location of the

must not be left to conjecture or surmise." *Commonwealth* v. *Perry*, 432 Mass. 214, 221 (2000). On the basis of this evidence, "[a] rational jury would not be warranted in inferring that the defendant was at the scene as a joint venturer. 'Such an inference would be speculative and highly unreasonable . . . .' " *Commonwealth* v. *Berry*, 431 Mass. at 333, quoting from *Commonwealth* v. *Green*, 420 Mass. at 780. See *Commonwealth* v. *Flynn*, 420 Mass. at 818; *Commonwealth* v. *Sanchez*, 40 Mass. App. Ct. at 418. In any case where, as here, "the evidence tends equally to sustain either of two inconsistent propositions, neither of them can be said to have been established by legitimate proof." *Commonwealth* v. *Flynn*, *supra* at 817. I would reverse.

PORADA, J. (dissenting in part). In *Commonwealth* v. *Daye*, 393 Mass. 55, 74 (1984), Justice Abrams writing for the majority of the justices on the Supreme Judicial Court stated, "Although we . . . hold that inconsistent grand jury testimony may be admitted in limited circumstances for its probative worth, we will not permit convictions based exclusively on inconsistent extrajudicial testimony to stand." I view this case as one which is based exclusively on inconsistent extrajudicial testimony and, thus, conclude that the Commonwealth failed to meet its burden of proving that the defendant was the perpetrator of the crime. *Ibid.* For this reason, I would reverse.

---

defendant and Mattox would place the defendant in the middle of Harvard Street, walking from the direction of the bridge, and Mattox "[d]irectly across the street on the next corner." The corner that could be seen when facing the defendant is that of Harvard and Greenwood. It must be assumed that Willis was looking in that direction in order to see the shooter when he made the observation as to where Mattox was standing. This unassailable fact coupled with the ballistics evidence, all of which was found in a northerly direction toward the Harvard street bridge, more readily supports the inference that all of the shots were made with the shooter's back toward the bridge, facing in the direction of Glenway Street.